## UNITED STATES v. TWO CASES OF SULPHO–NAPTHOL.

### (District Court, D. Maryland. March 28, 1914.)

1. DRUGGISTS (§ 11*)—"MISBRANDING"—INSECTICIDE.

   Insecticide labeled "Sulpho-Napthol," while containing less than four-tenths of 1 per cent. of sulphur, the presence of which was due to chemical or accidental impurities in the materials employed, without affecting either for good or ill the usefulness of the article, was misbranded within the Insecticide Act (Act April 26, 1910, c. 191, 36 Stat. 331 [U. S. Comp. St. Supp. 1911, p. 1368]), and under section 10 of the act must be condemned.

   [Ed. Note.—For other cases, see Druggists, Cent. Dig. § 10; Dec. Dig. § 11.*]

2. DRUGGISTS (§ 11*)—"MISBRANDING"—INSECTICIDE.

   Insecticide labeled "Inert Substance Water 7%, Insecticide 93%," while containing as much as 10.5 per cent. of water, was misbranded, within the Insecticide Act (Act April 26, 1910, c. 1911, 36 Stat. 331 [U. S. Comp. St. Supp. 1911, p. 1368]), and under section 10 of the act must be condemned.

   [Ed. Note.—For other cases, see Druggists, Cent. Dig. § 10; Dec. Dig. § 11.*]

Proceedings by the United States for the condemnation of two cases of sulpho-napthol by the Sulpho-Napthol Company. Decree of condemnation.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

John Philip Hill, U. S. Atty., and J. Craig McLanahan, Asst. U. S. Atty., both of Baltimore, Md.

William C. Coleman, of Baltimore, Md., Matthew Gault, and James L. Putnam, of Boston, Mass., for claimants.

ROSE, District Judge. In this case the government asks the condemnation of two cases of insecticide. They were seized under section 10 of the Insecticide Act of April 26, 1910 (36 Stat. 334, c. 191 [U. S. Comp. St. Supp. 1911, p. 1373]). Their contents were labeled "Sulpho-Napthol," "Inert Substance Water 7%, Insecticide 93%." The government charges misbranding in two particulars. First. Sulpho-napthol, as applied to an insecticide, means that the article so named is essentially either a composition of sulphur and napthol or a sulphur derivative of napthol. The product seized was neither. Second. It contained over 10 per cent. of water instead of the 7 per cent. stated on its label.

The Sulpho-Napthol Company is the claimant. It says the product called sulpho-napthol was invented by Samuel Cabot as early as 1884. It was then put on the market under that name and has continuously since been sold thereunder. The name was registered as a trademark as early as 1890 and again re-registered in 1907. Letters patent No. 305,423, September 23, 1884, were issued to Cabot for the article as a composition of matter and for the method of making it as a process. In the patent the article is said to consist of rosin dissolved in a solution of an alkaline sulphide holding in solution crude napthaline. The specifications show that, by napthaline, napthaline oils were intended. The process described consisted in dissolving rosin in a solution of alkaline sulphide and in adding thereto crude napthaline or the distillate obtained by heating the heavy products of distillation of coal tar between 200 and 225 degrees centigrade.

As early as 1868 or 1869, German chemical publications began to use the term "napthol sulphonic acid" to indicate a definite chemical compound. It does not appear that Mr. Cabot knew of such use or was likely to have known it. His insecticide was not that chemical compound. The two had no important quality in common, except that both could be used as insecticides. It is not shown that prior to 1884 the chemical compound ever was used for that purpose, nor does it appear probable that it was. The name "sulpho-napthol" was suggested to Mr. Cabot by the fact that he used a solution of alkaline sulphide to dissolve the rosin in his composition, and that important constituent was napthaline oil. After the patent had been issued and the name adopted, he discontinued the use of alkaline sulphide to dissolve the rosin. He employed in its place an alkaline hydrate, or, in common speech, caustic soda. Soda costs more than the sulphide. It does the work better. Sulphur was never an important part of the composition. There is language in the patent specifications which indicates that Mr. Cabot supposed that there would be some sulphur left in his product. Whether he was right in this is now immaterial. Under the changed process of manufacture, no sulphur is intentionally introduced into it. It usually in fact

contains something less than four-tenths of 1 per cent. of sulphur. The presence of this quantity is, however, due entirely to what may be called chemical or accidental impurities in the raw materials employed. The quantity of sulphur thus introduced does not in any appreciable way affect either for good or ill the usefulness of the article for the purposes for which it is sold. The chemical compound to which the Germans in the later '60's gave the name of naptho sulphonic acid has been since much more generally studied. The term has now a definite meaning to chemists and to many other persons who have connection with chemical industries. It is a matter of common knowledge that sulphur has time out of mind been supposed to be an insecticide. In many countries and at many times it has been and now is in various ways used as such.

Upon this state of the evidence the claimant expressed itself as being willing to consent to a decree of condemnation. It recognized that such a decree would cost it much in money and money's worth. The necessary relabeling and rehandling of its product would involve it in many practical difficulties. It believed and thought it knew that it had a valuable article, the usefulness of which had been demonstrated by some 30 years of trade popularity. It did not wish to put out its product under a name which could lead any reasonable person to believe that he was getting something other than he was. It frankly stated that it felt that every honest manufacturer had a vital interest in placing a broad and liberal construction upon the misbranding provisions of the Insecticide Act. It said it was willing to adopt another name. In so doing it will state that the product by the new name is the same which has been heretofore called sulpho-napthol. If it does, it will in some way convey the information that the article does not contain any appreciable quantities of sulphur or of any sulphur derivative.

A manufacturer may not give to his product a name which indicates the presence in it in substantial quantities of a constituent when such is not the fact. Libby, McNeill & Libby v. United States, 210 Fed. 148, 127 C. C. A. 14.

It follows that the decree for which the government asks and to which the claimant consents should be entered.

[2] During the progress of the case, the contention of the government that the article was also misbranded in that it contained a larger proportion of the inert substance water than was stated on the label became relatively unimportant. Water is used in making the article. As a practical matter it would not be possible to manufacture it commercially without adding some water to the caustic soda. The claimant had thought that the amount of water which it was necessary to add for this purpose became an integral part of the active constituents of the insecticide and was therefore not an inert substance. The quantity of water absolutely required for such purpose varied somewhat. It was not always easy to be certain that no more than the strictly necessary quantity was added. The claimant admitted that any water which exceeded the amount absolutely required was in the meaning of the law an inert substance. It was possible that such

water might sometimes amount to as much as 7 per cent. in weight or volume of the product as put on the market. It was for this purpose and with this meaning that it stated on its label that the product contained 7 per cent. of an inert substance, viz., water.

Since the seizure in this case, the claimant has had many tests and analyses made of its finished products. These show that in them the total amount of water, no matter from whence it comes, as a rule does not exceed 7 or 8 per cent. By some mischance the particular lot seized by the government, or some bottles of it at all events, happened to contain as much as 10.5 per cent. of water. These facts illustrate how difficult it would be in practice to enforce the law if it were to be construed as the claimant at first contended it should be.

In most cases it will be easy to ascertain by analysis the quantity of water or of other substances which in themselves have no insecticidal properties present in any particular product put upon the market. To determine by how much that quantity did or did not exceed what in the usual course of careful manufactures must necessarily be introduced into it would often be a very complex problem indeed. It is easy to state the approximate quantity of all actually inert constituents in the product. If the law makes everybody state it, no conceivable harm can happen to anybody. Under any other construction an honest manufacturer will find it difficult to compete with one not so scrupulous.

During the course of the trial, claimant came to recognize the force of the considerations just stated. If they are sound, the product was misbranded in that there was a material under statement of the quantity of water in it. The claimant has therefore consented to a decree against it on that ground also.

The question of what did or did not constitute an inert substance has been heretofore considered in this court in the case of United States v. Thirty Dozen Packages Roach Food (D. C.) 202 Fed. 271. The conclusions there reached would seem to require the decree for which the government asks and to which the claimant consents. The packages seized will therefore be condemned beacuse they were misbranded in both the respects alleged in the libel.

In view of the candid, enlightened, and public-spirited action which the claimant has taken, the decree of condemnation will be without costs to either side.