Staunton.

## CLINCHFIELD COAL CORP. V. RAY.

### September 20, 1917.

1. MASTER AND SERVANT—*Assumption of Risk.*—The servant as-
   sumes the risk of dangers which are known to and appreciated
   by him, or which are ordinarily incident to the service, or are
   open and obvious, which the law will infer are so known to
   him.

2. MASTER AND SERVANT—*Assumption of Risk—Changing Condi-
   tions.*—The doctrine of assumption of risk applies to chang-
   ing conditions at the place of work of the servant due to the
   progress of his work, or to the other operations of the master
   within view of the servant, but does not apply to other opera-
   tions of the master than those being performed by the ser-
   vant, from which the view by the latter of, and the view of
   him from, such operations was obstructed, and which opera-
   tions, if properly performed, need not have changed the con-
   dition or increased the danger of the place of work. In the
   latter case the master owes the duty of prevision with respect
   to what is likely to subsequently occur affecting the safety
   of the place of work.

3. MASTER AND SERVANT—*Assumption of Risk—Case at Bar.*—
   Where a servant, a track repairer, was given work by the as-
   sistant foreman in charge of a mine, repairing the track be-
   tween stationary cars left on the track in a mine, it is a
   non-assignable duty of the master to exercise ordinary care
   under the circumstances to prevent the moving trips of other
   cars coming into collision with the cars, left and expected to
   remain stationary, so as to drive or push them back upon and
   increase the danger of the plaintiff's place of work. The de-
   fendant having failed to place any signal or to otherwise exer-
   cise reasonable care to notify its other servants operating the
   motor and cars with a view to prevent such a collision and
   result as aforesaid, the subsequent action of such servants re-
   sulting in such collision and injury to the servant was but the
   natural and probable result of such negligence of the de-
   fendant. The proximate cause of the injury in such a case
   was the failure of the master to place any signal or to other-

wise exercise reasonable care to notify its servants operating its motor and cars, and hence the master is liable in damages for the injurious result to the servant.

4. MASTER AND SERVANT—*Non-Assignable Duty—Character of the Service.*—In the instant case it was urged that there was a distinction with respect to the application of the doctrine of assumption of risks to overhaulers and track repairers, but it is not from the difference in the character of the service that the non-assignable duty of the master to exercise ordinary care under the circumstances to prevent injury to the servant arises, but from the situation and surrounding circumstances in which the servant is placed and the knowledge, actual or constructive, of these factors in the case being brought home to the master.

5. NEGLIGENCE—*Superseding Cause.*—A cause, to be a superseding cause, must entirely supersede the operation of the negligence of the defendant, so that such cause alone, without the defendant's negligence contributing in the slightest degree thereto, in fact produced the injury. The intervention of the derailed car as described in the next syllabus was not a superseding cause of the injury.

6. MASTER AND SERVANT—*Volunteer.*—A track repairer was set to work repairing track in a mine. A miner having loaded a car with coal pushed it out on the track at the place where the track repairer was at work, but owing to a defect in the track the car was derailed. Thereupon the track repairer undertook to put it back upon the track so as to remove it and proceed with his work. While so engaged his leg was caught between this car and an empty car, with which a return trip of cars had collided, jarring the empty car violently back and catching the track repairer between it and the derailed car.

   *Held:* That the track repairer was not a volunteer in the work in his effort to replace on the track the derailed car.

7. APPEAL AND ERROR—*Conclusiveness of Verdict.*—In an action against a master by his servant, a track repairer, for injuries sustained while working in a mine, the verdict of the jury is conclusive on such questions as the contributory negligence of the plaintiff and that the defendant could not have reasonably anticipated a collision resulting in injury to the plaintiff, when the questions were submitted to the jury upon full and fair instructions.

Error to a judgment of the Circuit Court of Russell county, in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

## STATEMENT OF THE CASE AND FACTS.

This is a personal injury case in which there was a verdict of the jury in favor of the defendant in error—plaintiff in the court below—against the plaintiff in error—defendant in the court below—who will be hereinafter referred to as plaintiff and defendant.

There was, by the defendant, a demurrer to the declaration, a number of exceptions to the giving and refusing of instructions and a motion to set aside the verdict for misdirection of the jury and because contrary to the law and the evidence. This motion was overruled and the judgment complained of was entered in accordance with the verdict of the jury.

Considering the evidence under the rule applicable thereto in such case, the material facts are as follows:

### *Facts.*

The plaintiff went to work in the mine of the defendant about three months prior to the accident and up to the day of the accident was engaged in digging coal, except a night and day and part of another day in which he was engaged in work done by contract consisting of putting in some switches in the tracks for hauling coal cars in and out of certain entries in the mine. On the day of the accident the plaintiff did his first work as track repairer. The plaintiff worked that morning track repairing in another part of the mine. About noon on this day, the assistant mine foreman, Wright, in charge of the mine, came to and told the plaintiff he wanted the latter to "fix some track and put some (switch) throws in" in the heading of the mine where the accident afterwards occurred. Plaintiff replied, "I will do the best I can." This employment as track repairer was in pursuance of an understanding

reached between plaintiff and the foreman, about a week before, that plaintiff would do the best he could as track repairer, if called upon to do that kind of work.

Thereupon, just before 1 o'clock on December 27th the plaintiff first went to work putting the switch "throws in" and was engaged in that work when the foreman, Wright, came where the plaintiff was, took the plaintiff with him to a place in the same heading where the track had spread, i. e., where the rails of the track had gotten too far apart for the cars to pass safely over them, showed the plaintiff that the rails needed being brought into gauge, i. e., into the proper distance apart, and directed plaintiff to repair the track accordingly.

This place of work was not on the main line of track in the mine but on a branch line of track running into a drift or heading being worked only about 550 feet long. From the latter heading eleven rooms had been opened, turning off on both sides of it, from which coal was being mined. These rooms were numbered from 1, nearest to the entrance of this drift or heading, to 11, farthest from such entrance. The main track came from the tipple, outside the mine, in a straight line to and then turned off and passed by such entrance, going on to other parts of the mine deeper in it and farther from the tipple. The track in this heading switched off into each room as it passed them at what is called the necks or mouths of the rooms. These necks or mouths of the rooms were 50 feet apart Room No. 8 was about 400 feet from said entrance and there were beyond it farther on in the said heading only three other rooms, Nos. 9, 10 and 11, so that the heading extended only about 150 feet beyond room 8 and served only three rooms beyond room 8.

Just before the plaintiff was put to work repairing the spread track, the motorman and brakeman in charge of the motor which hauled the empty and loaded coal cars in

the mine, had taken all the loaded cars on the track in said heading out of the mine to the tipple. They had brought back a trip of empty ears (the number is left uncertain by the evidence, probably fifteen or sixteen) and left some of them beyond the mouth of room 8; and while the foreman was showing plaintiff what he wanted him to do with respect to repairing the track, the motorman and brakeman left the residue of such trip of cars (probably thirteen), along from the mouth of room 8 in the direction of room 5, leaving a space of about two car lengths (18 or 20 feet) opposite the mouth of room 8, between the empty cars thus left. The evidence leaves it uncertain how much space on the track the cars left on the hither side of room 8 occupied.

These empty cars were left on the track in said heading for those mining coal in the said rooms Nos. 1 to 11 inclusive to take into the rooms and load them with coal as they needed them. The method of the miners in taking the empty cars from the heading as needed, loading them with coal and disposing of the loaded cars, was as follows: The miner in each room when an empty car was needed would take it from the track, roll it in the room by hand, load it, then roll it out by hand, on the track in the heading to be later hauled out to the tipple by the motorman and brakeman operating the motor when enough loaded cars had accumulated on the heading track to make a "trip."

Having left the empty cars beyond and on the hither side of the mouth to room 8, as aforesaid, leaving a space opposite the mouth of room 8 of about 18 or 20 feet in width between the empty cars on the track on either side—which space we will hereinafter refer to as the place of work of the plaintiff—the motorman and brakeman with their motor went out of said heading to get other empty cars to

bring back and finish distributing or placing them along such heading. The later operation is referred to in the record as "placing up" the empty cars.

The method used of putting empty cars on the track in said heading was as follows: They were pushed into the heading by the motor, the empty cars being in front and the motor behind the trip of cars. The rules of the defendant required a light to be on the front of such moving cars.

The operation of "placing up" aforesaid, from the nature of it, was likely to result in a movement of the empty cars left stationary on the track as aforesaid, unless those in charge of such operation were aware at the time of some reason why such a movement should be avoided, even though there was a light on the front of a return trip of empty cars.

The said place of work of the plaintiff and the whole of said heading, and indeed the whole mine, was in darkness, as incident to the normal operation of a mine under ground. The plaintiff and helper had headlights on their caps, but they were insufficient to notify the brakeman or motorman that they were at work between the cars. No one placed any signal to notify the motorman and brakeman of that fact, so as to avoid the probable result of their not knowing or of their forgetting, if they once knew, that some one was working between the cars, namely, a collision with and pushing back of the cars on the track so as to endanger the plaintiff in his place of work.

At said period of time in the operation of the mine and the situation aforesaid, the said foreman, Wright, came with the plaintiff to the place of work of the latter aforesaid and put the plaintiff to work repairing the track as aforesaid.

The foreman then saw the situation at and surrounding such place of work. Thereupon such foreman left the

plaintiff engaged at work as directed by him as aforesaid, went toward the entrance of the heading, passed on along and out of said heading; saw that no such signal as aforesaid was placed; placed none and ordered none to be placed; met the next return trip of fifteen or twenty empty cars being brought to finish distributing them along the heading, at the entrance to the said heading, and made no effort to caution or warn the brakeman or motorman against the danger of colliding with the stationary cars aforesaid, left standing on the track with the plaintiff at work at his place of work aforesaid between them, or to remind them that the plaintiff was still at work there.

While the motorman and brakeman were gone for such return trip of empty cars, the miners working in rooms 2, 3 and 4, took three of the cars theretofore left on the track as aforesaid, into such rooms, leaving some ten cars stationary on the track between room 5 and the place of work of the plaintiff.

The evidence is conflicting as to whether the brakeman was on the front end of the return trip of cars or some 75 or 100 feet back from such end. In either case, if there had been a suitable signal light for the purpose of notification aforesaid he could have seen it; or if the brakeman or motorman had otherwise been notified as aforesaid by the foreman as the cars passed him as aforesaid, the same purpose would have been accomplished.

The return trip of cars passed on into said heading, where plaintiff was at work, for the purpose of distributing such supply of cars as aforesaid, and in the darkness, there being no light on the end of the stationary cars which they were approaching, or other light or signal otherwise located, to notify the brakeman and motorman that some one was working at the place of work of the plaintiff (and with no light indeed on the front end of the return trip of cars according to the testimony for plaintiff), and the

brakeman and motorman not then thinking of the fact that the plaintiff might still be in his place of work aforesaid, although they knew before they went out for such return trip that he had undertaken to do the work of repairing the track there, and they not at the time knowing or realizing that the plaintiff was at work as aforesaid, the return trip of cars collided with and jarred back said stationary cars so hard that they were thrown violently back, causing the leg of the plaintiff to be caught and broken.

The brakeman immediately after the accident attributed it to the cause—"I didn't know that you (the plaintiff) were in there; I couldn't see"—or as differently expressed, "I could not see, I did not know you were in there."

There were many and serious conflicts between the testimony for plaintiff and defendant, but the foregoing are the facts on the points referred to, according to the testimony for the plaintiff.

The plaintiff's leg was not caught between the two cars originally left on each side of his place of work. The precise manner in which the injury occurred was as follows:

After the said foreman left as aforesaid, a miner in room 8, having loaded a car he was engaged in loading with coal, pushed it out on the track in the heading where plaintiff was at work. The latter made his escape from this car, but owing to the spread of the track at that place, it derailed. Thereupon the plaintiff and his helper undertook to put it back upon the track so as to remove it and proceed with his work, as he had been urged to complete it, by said foreman, so that the track could be used, and while so engaged his leg was caught between this car and the next empty car on the hither side of room 8 by the jarring back of the cars aforesaid.

There was testimony in the case for the defendant to the effect that it was the duty of the motorman to replace derailed cars by the use of the motor to pull them on the

track, but the evidence for plaintiff shows that this was unknown to him and could not have been reasonably expected to have been known to him, and that his effort to replace the derailed car on the track was work done in the reasonable discharge of the duties placed upon him by the direction of the defendant through its said foreman and it was reasonably to be expected and foreseen by the defendant that such a casualty might occur and that the plaintiff would so act under the circumstances.

The declaration when considered on the demurrer to it, and the evidence in the case when considered under the rule applicable in this court, does not disclose that the plaintiff knew before the accident that no signal of notification aforesaid would be placed by defendant and that no act would be done by the latter, if called for in the exercise of ordinary care on the part of the defendant, to prevent moving trips of cars endangering his place of work; nor that there was any method in this regard so established in the operation of the mine of defendant with respect to such a situation as that in which the plaintiff was placed, as that it could be considered as the ordinary method of such operation, that no such notification would be given by the defendant, from which the plaintiff's knowledge of such method could be inferred. The whole evidence, including that for the defendant, fails to show that a track repairer had, on any occasion before that in the instant case, been put to work between cars left stationary on the track, obstructing his view of, and the view of him from, an approaching trip of cars. That is to say the situation in which the plaintiff was placed was unusual; no custom with respect to the presence or absence of signals for his protection in such a situation had grown up or existed in the ordinary course of the employment or service in defendant's mine.

*Fulton, Burns & Kidd* and *Morison, Morison & Robertson,* for the plaintiff in error.

*Werth & Werth,* for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the opinion of the court.

The assignments of error, while numerous, raise only a few questions which are material, in the view we take of the case. Such questions will be considered and passed upon in their order as stated below.

The decision of most of the questions raised as aforesaid turns upon the application of the doctrine of assumption of risk.

That doctrine is well settled. The servant assumes the risk of dangers which are known to and appreciated by him, or which are ordinarily incident to the service or are open and obvious, which the law will infer are so known to him.

The chief question which we have to consider is—

1. Were the dangers incident to the place of work of the plaintiff all assumed by him, so that the defendant owed him no duty of prevision with respect to what was likely to subsequently occur affecting the safety of such place, which might be caused, (a) not by changing conditions at the place of work of the servant due to the progress of his work, or to the other operations of the master within view of the servant, but (b) to other operations of the master than those being performed by the servant, from which the view by the latter of, and the view of him from, such operations was obstructed, and which operations, if properly performed, need not have changed the condition or increased the danger of the place of work?

It is well settled that in cases falling within the class of cases (a) referred to in the above question, the doctrine of assumption of risk applies.

· *N. & W. Ry.* v. *Nuckols,* 91 Va. 201, 21 S. E. 342; *Hambly's Case,* 154 U. S. 349, 14 Sup. Ct. 983, 38 L. ed. 1009, and numerous other cases from other jurisdictions, involving injury to track repairers, cited and relied on for defendant. ·The same is true of the railroad yard cases of *Pittard's Adm'r* v. *So. Ry. Co.,* 107 Va. 1, 57 S. E. 561; *N. & W. Ry.* v. *Belcher,* 107 Va. 340, 58 S. E. 579, and *W. S. R. Co.* v. *Grove's Adm'r,* 113 Va. 411, 74 S. E. 148, cited and relied on for defendant.

We are of opinion that the instant case falls within the class of cases (b) referred to in the next above question, and that the principle on which rests the case of *R. & D. R. Co.* v. *Norment,* 84 Va. 167, 4 S. E. 211, 10 Am. St. Rep. 827, is decisive of the question we are considering in favor of the plaintiff. The duty of prevision aforesaid rests upon the master in such a case. It concerns the place of work of the servant and hence is a non-assignable duty of the defendant to exercise ordinary care under the circumstances to prevent the moving trips of other cars coming into collision with the cars, left and expected to remain stationary, so as to drive or push them back upon and increase the danger of the plaintiff's place of work. The defendant having failed to place any signal or to otherwise exercise reasonable care to notify its other servants operating the motor and cars with a view to prevent such a collision and result as aforesaid, the subsequent action of such servants resulting in such collision and injury to plaintiff was but the natural and probable result of such negligence of the defendant. That is to say:

The proximate cause of the injury in the instant case was the failure of defendant to place any signal or to otherwise exercise reasonable care to notify its servants oper-

ating its motor and cars as aforesaid, and hence the defendant is liable in damages for the injurious result to the plaintiff.

It is urged for defendant that there is a distinction with respect to the application of the doctrine of assumption of risks to overhaulers, as in the *Norment Case,* and track repairers, as in cases cited and relied on for defendant as aforesaid. In principle, it is not from the difference in the character of the service that the non-assignable duty aforesaid arises, but from the situation and surrounding circumstances in which the servant is placed and the knowledge, actual or constructive, of these factors in the case being brought home to the master.

2. Was the intervention of the derailed car a superseding cause of the plaintiff's injury?

It is elementary that a cause, to be a superseding cause, must entirely supersede the operation of the negligence of the defendant, so that such cause alone, without the defendant's negligence contributing in the slightest degree thereto, in fact produced the injury. *City Gas Co.* v. *Webb,* 117 Va. 269, 84 S. E. 645.

It is obvious, therefore, that this question must be answered in the negative.

3. Was the plaintiff a volunteer in work in the effort to replace on the track the derailed car?

The statement of facts on this subject noted above sufficiently answers this question in the negative.

4. We have not noticed above other considerations urged for the defendant, such as that by the manner in which the plaintiff attempted to restore the derailed car to the track he caused his own injury; that the plaintiff was in effect guilty of contributory negligence because, in the exercise of reasonable care on his part, he might have seen or heard the approaching cars, which caused the collision which resulted in his injury, in time to have avoided that result;

42

and that the plaintiff was guilty of such negligence because of various other things. It is deemed sufficient to say that these and all other questions of fact were submitted to the jury upon full and fair instructions to them, and the verdict of the jury is conclusive upon us as to such matters.

5. It is further claimed for defendant that its foreman —and hence the defendant—could not reasonably have anticipated a collision resulting in injury to plaintiff as it occurred—"that the plaintiff would be struck by a car and pinned up against a loaded car which was not at the place when the foreman was there."

This very question of fact was submitted to the jury under two instructions as asked for by defendant, which were extremely favorable to it. The verdict of the jury, therefore, is conclusive on the subject.

For the foregoing reasons we find no error in the action of the trial court and the judgment complained of must be affirmed.

*Affirmed.*