UNITED STATES v. THIRTY DOZEN PACKAGES OF ROACH FOOD.

(District Court, D. Maryland.   January 28, 1913.)

DRUGGISTS (§ 2*)—INSECTICIDE ACT—INTERSTATE COMMERCE—"INERT."
    Insecticide Act April 26, 1910, c. 191, § 8, par. 4, cl. 3, 36 Stat. 333 (U. S. Comp. St. Supp. 1911, p. 1372), provides that an insecticide shall be deemed misbranded, except in case of paris greens and lead arsenates, if it consists partially or completely of "an inert substance or substances which do not prevent, destroy, repel or mitigate insects," unless the names and percentage amounts of such inert ingredients are stated on the label, or the names and percentage amounts of every ingredient having

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

insecticidal properties and the total percentage of all inert ingredients are so stated. *Held,* that the word "inert," as so used, is not limited in meaning to a substance which serves no useful purpose in the compound, but includes any substance which is not in itself capable of killing or repelling insects, although it may be useful and used for the purpose of attracting them.

[Ed. Note.—For other cases, see Druggists, Cent. Dig. § 1; ·Dec. Dig. § 2.*]

Proceeding by the United States for condemnation of Thirty Dozen Packages of Roach Food. On exceptions to answer. Exceptions sustained.

John Philip Hill and J. Craig McLanahan, U. S. Attys., both of Baltimore, Md.

Charles McHenry Howard, of Baltimore, Md., for defendant.

ROSE, District Judge. The question for determination is the meaning of the word "inert" in clause 3, par. 4, § 8, Insecticide Act 1910. By that clause an insecticide, other than paris green· or lead arsenate, is declared to be misbranded—

"if it consists partially or completely of an inert substance or substances which do not prevent, destroy, repel or mitigate insects or fungi and does not have the names and percentage amounts of each and every one of such inert ingredients plainly and correctly stated on the label: Provided, however, that in lieu of naming and stating the percentage amount of each and every inert ingredient, the producer may at his discretion state plainly upon the label the correct names and percentage amounts of each and every ingredient of the insecticide or fungicide having insecticidal or fungicidal properties, and make no mention of the inert ingredients, except in so far as to state the total percentage of inert ingredients present."

The United States is seeking to have condemned certain packages which are labeled "Peterman's Roach Food, Fatal to Roaches, Water Bugs and Beetles." These packages have been shipped in interstate commerce. Their contents are insecticides within the meaning of the act and are not either paris green or lead arsenate. The government says that the packages are misbranded, because they consist partially of certain inert substances, to wit, wheat flour and small amounts of other substances, which do not prevent, destroy, repel, or mitigate insects, and that the name and percentage amounts of each and every one of such inert ingredients is not plainly and correctly stated upon the labels of the packages, nor is there stated the correct names and percentage amounts of each and every ingredient having insecticidal properties and the total percentage of inert ingredients.

The claimant in its answer in effect says that the wheat flour and the other substances not in themselves poisonous found in its product are in the nature of food or bait attractive to the insects which it is sought to kill, and necessary to induce them to eat the poison or take it into their mouths or jaws. It asserts that these poisonous and non-poisonous substances are compounded in such proportions and incorporated together in such manner as to produce the effect of prevent-

ing, destroying, repelling, and mitigating such vermin. Neither class of said substances, if used separately and without being compounded with the others, would produce the desired result. It therefore contends that its preparation contains no inert or inactive ingredients, or any substances which are not necessary to destroy, repel, or mitigate roaches and similar insect pests.

To the sufficiency of this answer the government has excepted. At the hearing of the exceptions the learned counsel for the claimant with great wit and force argued that the purpose of its preparation was to kill many roaches, that this purpose could not be attained unless the preparation was made attractive to them, that everything which drew them to it was a useful and active agent in bringing about the wished-for result, and that nothing which contributed to the end in view was "inert" within the meaning of the statute.

According to this reasoning "inert" means useless. To add intentionally and unnecessarily a useless substance to a compound sold for a specific purpose is to adulterate it. The claimant says that the provisions of the statute in question are intended to prevent adulteration—that is to say, protect the public against being led to pay its money for that which will not serve its purpose. The government admits that such is the ultimate result which Congress sought to bring about; but it says that Congress thought that the most effective, if not the only practical, way of reaching that end was to require the shippers of such insecticides to tell on their labels the quantity and kind of the elements which would actually kill or drive away insects, and the quantity and kind of the elements which were not themselves capable of killing or driving away one or many insects.

This view accepts the claimant's contention that, if you would in fact poison with something which will poison, you must oftentimes mix with it something which is in itself harmless, or even beneficial. It points out that many insecticides, to be of practical value, must be distributed rapidly and cheaply in the form of sprays and otherwise. In order that this may be successfully accomplished, the poisons or repellants may have to be diluted, and sometimes greatly diluted. In some cases in which such dilution may be required, it may also be essential that something which will induce the insects to eat the poisons shall be mixed with them. Under such circumstances it might be possible to argue that almost anything which was mixed with the poison or repellant served some useful purpose. Such contention would often be untruthfully made, and yet frequently it would be both difficult and costly to demonstrate its untruth to court or jury.

The government contends that Congress intended to get rid of such controversies by the simple expedient of requiring the shipper of the preparations to tell on the label what was in them. Whether he did so with approximate truth or not could usually be easily and certainly settled by an analysis. Neither side claims that anything in the proceedings of Congress throws any light upon the merits of their respective contentions. What the congressional intent was must be gathered altogether from the act itself and from a comparison of

its language with that of the Food and Drugs Act (Act June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1911, p. 1354]), upon which it is modeled.

The Insecticide Act contains 14 sections; the Food and Drugs Act, 13. The Insecticide Act contains a section providing that it shall be referred to as the Insecticide Act of 1910. There is no similar provision in the Food and Drugs Act. Otherwise the two enactments contain the same number of sections, in precisely the same order, and in very large part in precisely the same words. Obviously the draftsman of the Insecticide Act took the Food and Drugs Act and copied it literally, except where alterations were necessary in order to adapt it to the purpose in view, or where he wished to make a definite change in a particular provision. From the changes which were so made, it is possible to gather something of the purpose of some of the new provisions in the later act.

The claimant says that an inert substance within the meaning of the act is something which does not contribute to the effectiveness of insecticides—that is, something which serves no useful purpose therein. An insecticide containing such a substance, when compared volume for volume with another which did not, would be of inferior quality or strength. If the framer of the act had intended by the clause now under consideration to do nothing more than prevent the introduction of such valueless substances into insecticides, he had apt language before him in the model which he was using.

. Section 7 of the Food and Drugs Act declares that a food shall be deemed to be adulterated if any substance has been mixed and packed with it, so as to reduce or lower or injuriously affect its quality or strength. Such a provision would apparently accomplish all that the claimant says was intended to be accomplished by the clause, the construction of which is now in controversy. The lawmakers did not think it would in the case of insecticides, other than paris green and lead arsenates. They do provide in section 7 of the Insecticide Act that a paris green or a lead arsenate shall be deemed to be adulterated if any substance has been mixed and packed with it, so as to reduce or lower or injuriously affect its quality or strength. They do not make such provision with reference to insecticides other than paris green and lead arsenates. On the other hand, they do not make applicable to the two latter any such clause as that now under discussion.

The lawmakers did not think it expedient or possible to say that any substance which, when mixed and packed with an insecticide, reduced or lowered its strength, was an adulterant. The explanation why it was not expedient or possible so to say is given by the claimant itself. In many insecticides, other than paris green and lead arsenates, substances which do reduce and lower their strength are absolutely necessary, in order that they may effectively do the work for which they are intended. Such substances could not be declared adulterants. The problem is solved by requiring the shipper of such insecticides to tell the kinds and quantities of the substances therein contained which do not themselves prevent, destroy, repel, or mitigate

insects. From the standpoint of the honest purchaser and shipper, there could be only one objection to this legislation. In some circumstances it might result in the revelation of a trade secret.

This objection was obviously taken into consideration by Congress. For the purpose of rendering such disclosures less probable or frequent, Congress gives the shipper an alternative. He may, if he will, instead of stating the kinds and proportions of inert substances so defined, confine himself to telling the total percentage of all such substances in his preparation; but, if he does, he must tell the specific kinds and proportions of the active poisons or repellants. It may be that in some cases that to do one or the other will give valuable information as to trade secrets. Claimant says that in its case such will be the result of the enforcement upon it of the construction for which the government contends. Such arguments may well be addressed to Congress. They may, where it does not appear that the intention of Congress has been called to them, affect the construction which the courts may put upon the general language of an act.

In this case, however, the clause in controversy itself shows that Congress had actually considered the extent to which it would go in compelling disclosures which might result in the revelation of trade secrets. Under its power to regulate commerce among the states, Congress had power to do what the government says it sought to do, and which I think it did do.

It follows that the exceptions of the government to the claimant's answer must be sustained.