## ROY McCLANAHAN AND OTHERS v. CALIFORNIA SPRAY-CHEMICAL CORPORATION.

April 20, 1953.

Record No. 4057.

Present, All the Justices.

The opinion states the case.

*George Gilmer, Hardy C. Dillard, Charles K. Woltz, Thomas J. Michie,* for plaintiff in error.

*John S. Battle, Jr., John L. Abbot,* for defendant in error.

SMITH, J., delivered the opinion of the court.

This is an action sounding in tort instituted by Roy McClanahan and others against the California Spray-Chemical Corporation to recover a judgment for $75,048.34, because of damage to their apple orchard which allegedly resulted from the application of Tag, an orchard spray manufactured by the defendant. There was a verdict for the plaintiffs in the amount of $30,000.00, but upon motion of the defendant the trial court set the verdict aside and rendered final judgment for the defendant. To this judgment a writ of error was awarded the plaintiffs.

In the spring of 1949 the plaintiffs and E. J. Meeteer owned and operated Carter's Mountain Orchard comprising some 230 acres of land in Albemarle county near Monticello. Plaintiff Roy McClanahan, an orchardist of some twenty years experience, was the managing partner and co-plaintiff Oscar Detamore was the foreman. Meeteer took no active part in the operation and in June of 1949 sold his interest in the orchard to the plaintiffs.

Since 1906 California Spray-Chemical Corporation has been in the business of manufacturing and marketing insecticides and fungicides. It is, and was in 1949, a large organization with marketing outlets covering the entire United States. In connection with its production and marketing division it conducts a research division, which in 1949 was staffed by twelve research chemists engaged in the development and testing of new economic poisons.

In order to follow the events that led up to this suit it is necessary to have some understanding of the physiological processes performed by the apple tree and the nature, operation, and control of the disease known as apple scab.

With the coming of warm weather in the spring the leaf buds on the apple tree swell and break and the leaves appear. These leaves, known as primary leaves, are seldom larger than a nickel. Their principal function is to supply energy for the bloom

and the setting of the fruit. With the continuance of warm weather the blossom buds (which were set the preceding spring and summer) turn pink and open, the blooms are pollinated by insects, the petals fall, and the fruit is set. Soon after petal fall the secondary leaves appear. These are fully developed within three or four weeks and comprise more than ninety percent of the leaf surface of the tree. Their function is to supply energy to produce the crop of fruit and to set the fruit buds for the following year.

One of the perils in the growing of apples is apple scab. This disease is a fungus whose habit of life is directly conditioned to the life habit of the apple tree. The fungus, similar to a mushroom but of microscopic size, lives during the winter in the dead leaves under the trees. The warm weather in spring which causes the leaf and fruit buds to swell and burst on the tree also causes the scab fungus to ripen. When it rains the spores of the fungus are shot up and widely scattered by the air and wind and some, of course, are deposited on the apple foliage. Since these spores are shot up from the ground only when it rains, it naturally follows that at that time the foliage would be wet. Under warm and moist conditions the spores root themselves into the leaves and spread out in all directions. Millions of these spores growing together appear as the brown lesion which is called scab. Depending on the temperature, it takes from one to two weeks after a leaf is infected before the scab lesions are visible to the naked eye. This is the primary scab lesion caused by spores shot from fungus on the ground. This type of primary infection and lesion occurs whenever moisture and temperature conditions are favorable during the two-or-three-week period ending usually around the time of petal fall. After this there is no further risk of primary infection from the ground until the next year. However, the spore-bearing fungi on the leaves remain indefinitely as a source of secondary infection. These spores are not shot into the air, but each time it rains they are washed and splashed onto the leaves and fruit and the process of infection is repeated. The resulting lesions are called secondary scab lesions, which are in turn a source of further infection unless controlled.

Orchardists in Virginia control scab by spraying with materials of two general types. One type is merely a protectant; that is, it covers the tree with a protective coating so that the

scab spores which fall on it or are washed about it are killed before they can root. This class of sprays includes, among others, the wettable and paste sulphurs. The other type of material generally used is not only a protectant but an eradicant. It attacks the airborne scab spore in the period before it has rooted and also attacks the spores and fungi later produced on the tree. In this class of material are to be placed lime sulphur and defendant's product, Tag.

In the normal program of spraying an apple orchard the first spray is the ''dormant spray,'' which is applied before the buds begin to break. Then follow the ''pre-blossom sprays,'' which are applied from the time the center blossom buds first turn pink until the blossoms appear. (Included here are the ''pre-pink'' and ''pink'' sprays). Then there is the ''petal-fall spray,'' which is applied when most of the blossom petals have fallen. Thereafter the sprays are designated ''cover sprays'' and their number depends on conditions prevalent at the time. The spray period involved in this case is the first cover spray.

In February or March of 1949 Wallace J. Majure, defendant's field representative in Virginia, called on plaintiff McClanahan for the purpose of acquainting him with a new mercury base spray called Tag Fungicide No. 331, which had been developed by Dr. Walter Reed of defendant's research staff for the control and eradication of apple scab. The defendant was marketing this product for the first time in the spring of 1949 and to encourage its sale Dr. Reed, had prepared an informative pamphlet which Majure showed to McClanahan and copies of which he left with him. The pertinent language of this pamphlet is set out in the margin.[1]

---

[1]                     TAG Fungicide No. 331

Here is a new fungicidal liquid containing organic mercury. It mixes readily with water for spray applications for both the protective and after infection control of apple scab. (Note Label Directions and Caution.)

For many years, fruit growers have needed a fungicide that would do three things:
1. Protect fruit and foliage against infection by apple scab spores.
2. Prevent the development of apple scab fungus when applied following rains during which scab infection had taken place.
3. Inactivate or kill the scab spores and fungus and scab spots already showing up, and thus prevent further spread of the disease.

In addition to controlling scab in the three ways mentioned above, the fungicide should be chemically and biologically compatible with other insecticides and fungicides that are normally applied at the same time.

TAG Fungicide No. 331 not only provides this type of scab control but is also easy and economical to use.

In early May of 1949 there were good prospects for a large apple crop in plaintiffs' orchard; both foliage and fruit appeared in good condition and there was a heavy set. The customary spray program had been followed that spring. Specifically for the control of scab there had been an application of lime sulphur in the "pre-blossom spray" on April 10 and of flotation paste sulphur in the "petal-fall spray" on April 28. However, there was some indication of scab, although the condition was no worse than usual.

On May 9, 1949, W. L. Holtzman, salesman for one of defendant's Virginia distributors, while in the plaintiffs' orchard observed the scab condition and recommended the use of Tag. McClanahan accordingly ordered a supply of the product. The Tag came in bottles, each of which bore a label. The directions for use on the label were identical with those contained in the pamphlet heretofore referred to. The caution statements also were identical, except that the label cautioned against using Tag later than petal fall (instead of two weeks following petal fall as provided in the pamphlet) where there was a possibility of residue remaining at harvest. Aside from this warning as to residue and the caution that Tag was poisonous and in undiluted form would burn the skin, there was no warning or caution statement of any other hazard involved in its use.

The Tag, properly mixed, was sprayed on the orchard during the period May 11 through the 13th, by experienced and·

---

### DIRECTIONS FOR USE

Use Tag Fungicide No. 331 at the rate of ½ pint to 100 gallons diluted spray, applied in the pre-blossom and petal fall spray applications. Tag Fungicide No. 331 may be combined with lead arsenate, hydrated lime, DDT, Benzene Hexachloride, Tetraethyl pyrophosphate and other insecticides normally used. Do Not use with oil emulsions or liquid lime sulfur.

When combined with wettable sulfur use Tag Fungicide No. 331 at the rate of ¼ pint to 100 gallons diluted spray, added to all the regular sulfur applications prior to and including petal fall spray. This dosage should be increased to ½ pint whenever it is likely that scab infections have occurred following prolonged rain periods. Consult your local agricultural authority for correct time for scab sprays in each locality.

### CAUTION

Contact of the undiluted concentrate with the skin and eyes will cause irritation and severe burning and blistering of the skin. Wash off with plenty of water immediately. For eyes, get medical attention. Flush with water for 15 minutes.

Various restrictions have been placed on the use of pest control chemicals on food crops where there is a possibility of residue remaining at harvest. Do not use this product on bearing apple trees later than two weeks following petal fall or the first cover spray, whichever comes first.

careful workmen. While the spray was being applied, Russell Dorman, a vice-president of defendant and its manager for the sales district which included Virginia, visited the orchard. He is a trained scientist and research man, particularly so with respect to apple trees. Dorman had come to the orchard with several of his subordinates, because he had heard that Tag was being applied. He was examining the leaves with a magnifying glass when Detamore approached and asked if he could tell whether Tag was having any effect on the scab. Detamore was told that it was too soon after the application to be sure, but that it looked like the Tag was killing the scab. Detamore further testified, though this is denied by Dorman, that he was also advised to go back with another application of Tag when the first spray was finished.

There was, however, no occasion for another application. On May 14, 1949, McClanahan was called into the orchard where he found that many of the leaves, particularly on the trees that had been sprayed the first day, had begun to roll up, turn brown, and dry out. The poison oak and Virginia creeper growing on the ground under the trees were also burned and had curled up. This condition continued for eight or ten days when the leaves began to drop. Efforts were made to revive the foliage by spraying an application of liquid nitrate, but without avail. As a result of the injury to the trees the 1949 apple crop was a commercial failure and the 1950 crop also failed to materialize, because the fruit buds which would normally have formed during the spring and summer of 1949 had failed to do so.

There are nine trees in the plaintiffs' orchard which are located near the buildings apart from the main orchard. The scab condition on these trees was not markedly different from that of the remainder of the orchard. Because of their location they are usually sprayed last and had not been sprayed when the damage to the leaves of the other trees was first noticed. Consequently they were not sprayed with Tag, but were sprayed with sulphur sprays. They lost no leaves, bore a good crop of fruit in 1949 and had a good bloom and a good yield of apples in 1950.

The plaintiffs' amended motion for judgment filed on January 9, 1952, alleged, in part, that "(3) Phenyl mercuric acetate was at that time [May of 1949] a new spray for the control of apple scab, which was highly dangerous to orchards

unless properly used. It had not been used in Virginia, at least to any extent prior to 1949 and was a spray with which apple orchardists in Virginia were not familiar. These facts were well known to the defendant and it was, therefore, the duty of the defendant to put on the bottles containing Tag, or otherwise give to the purchasers thereof directions for a safe and proper use and warnings of the danger of improper or untimely use."

The amended motion for judgment further alleged that it was unsafe to use Tag on apple trees in Virginia later than the time for the pink spray, or when temperatures are high, or after scab had gotten well under way, but in no way did the defendant warn of the danger of using Tag when the temperature was high or after scab had gotten well started on the trees.

In its grounds of defense "the defendant alleges that it exercised due and proper care in developing and testing said spray material and, before marketing and distributing the same, placed on each container in which it was sold or distributed all proper warnings, directions, cautions and notices and that by means thereof each purchaser, and particularly the plaintiffs, their agents and assignors, were advised of the proper methods and time for its use, insofar as the defendant knew or in the exercise of ordinary care should have known; * * *."

The defendant also contended on the motion to set aside the verdict and on the argument before this court that if the plaintiffs had followed the directions on the label and had sprayed in the pre-blossom and petal-fall spray applications no injury would have resulted from the use of Tag. Its position is stated thus: "Defendant submits there was no error [by the trial court in setting the verdict aside] because it gave adequate directions for the safe use of its spray, but plaintiffs failed to follow those directions which resulted in the damage complained of."

The plaintiffs argued that they followed the directions contained in the labeling, and that even if they did not, the defendant is not relieved of its duty to warn or caution of unusual hazards or dangers that should be reasonably anticipated from the use of Tag. Furthermore, they contended that this duty is recognized at common law and required by federal and Virginia insecticide statutes.

The trial court submitted the issue to the jury on proper instructions, one of which is as follows:

"The Court instructs the jury that they cannot find for the

plaintiffs simply because they believe they have suffered an injury as a result of use by them of Tag but it is necessary before there can be any recovery by the plaintiffs for them to establish by a preponderance of the evidence that the label on the bottle did not contain a warning or caution statement which was necessary and, if complied with, adequate to prevent injury to the orchard and that as a consequence thereof the injury complained of resulted.''

The jury returned a verdict for the plaintiffs (the amount of which is not in issue) and it is supported by evidence showing that the damage to the plaintiffs' orchard was caused by the use of Tag. Under the instructions, the jury could have found that the label on the bottles of Tag did not contain a warning or caution statement which was necessary and, if complied with, adequate to prevent injury to the plaintiffs' orchard; and, that the plaintiffs did follow commonly recognized safe practice in their use of Tag.

The trial court set aside the verdict, because it had then concluded that the defendant had exhausted its duty to the plaintiffs by giving directions for use; that plaintiffs had not followed the directions; and, that as a matter of law the statute imposed on the defendant no duty to warn of hazards to apple trees in using Tag. More specifically, the trial court held that the warning provisions in the statute do not apply to what may happen to the object being treated if directions are not followed but only to incidental damages not connected with the purpose for which the spray is intended to be used.

Our discussion will be directed primarily to the first question presented by the plaintiffs, *viz:* Do the Virginia Insecticide, Fungicide and Rodenticide Law and the Federal Insecticide, Fungicide, and Rodenticide Act impose on defendant manufacturer of a new economic poison a duty to warn plaintiffs of the unusual hazard involved in the use of its poison?

The Virginia Insecticide, Fungicide and Rodenticide Law, codified in Chapter 12, Title 3, of the Code of 1950, is in all relevant respects similar to the Federal Act, U. S. C. A., Title 7, §§ 135-135k, enacted in 1947, and to acts passed in many other states. The first comprehensive Federal Act known as The Insecticides Act was passed in 1910, c. 191, 36 Stat. 335, and the first measure in Virginia, which was modeled on the then existing

federal law, appears in Chapter 477 of the Acts of 1922. This act was superseded by Chapter 468 of the Acts of 1948.

Since the amended federal and Virginia statutes are of such recent origin, we have found no cases on the point herein involved, nor have any been called to our attention. It is, however, important to observe that the federal act as originally drafted and as subsequently amended was inspired by and drew heavily on the experience gained under the Federal Food and Drugs Act of 1906, U. S. C. A., Title 21, § 1, *et seq.*, which was amended in 1938, U. S. C. A., Title 21, §§ 301-392, and is now known as the Federal Food, Drug, and Cosmetic Act. The Federal Food, Drug, and Cosmetic Act and the Federal Insecticide, Fungicide, and Rodenticide Act are animated by a common philosophy, governed by a common purpose and, allowing for differences in the objects covered, in large measure couched in the same language. This is apparent from a comparison of the acts and their legislative history and is recognized by the courts. *United States* v. *Two Cases of Chloro-N. Disinfectant,* 217 Fed. 477 (D. Md. 1914) ; *United States* v. *Thirty Dozen Packages of Roach Food,* 202 Fed. 271 (D. Md. 1913).

Back of both the federal and Virginia statutes lies the need to provide the particular consumer and the general public with a higher and surer degree of protection than is afforded by exclusive recourse to common-law remedies. As stated in *United States* v. *Dotterweich,* 320 U. S. 277, 280, 64 S. Ct. 134, 136, in reference to the Federal Food, Drug and Cosmetic Act:

"The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words."

This quotation, frequently cited with approval (*e. g., 62 Cases, Etc.* v. *United States,* 340 U. S. 593, 71 S. Ct. 515; *United States* v. *Sullivan,* 332 U. S. 689, 68 S. Ct. 331), lies back of the liberal interpretation which the courts have insisted upon in construing the Federal Food, Drug and Cosmetic Act. This construction is likewise relevant to the Insecticide, Fungicide and Rodenticide Law.

It is consistent with the liberal interpretation which the act commands to hold, in keeping with general principles of

tort law, that violation of the statute constitutes negligence as a matter of law precluding the need for establishing the common-law elements of negligence. The statute itself creates the standard of conduct required.

Thus in *Crist* v. *Fitzgerald,* 189 Va. 109, 52 S. E. (2d) 145, a case involving the violation by the defendant of The Motor Vehicle Code of Virginia, this court stated in 189 Va. at p. 118 that:

"The violation of a statute constitutes negligence *per se,* and if it proximately causes or contributes to an injury, it will support a recovery of damages for such injury."

The fact that the Virginia insecticide statute imposes a criminal penalty (Code, § 3-208.42) is evidence of the high standard of care exacted of the manufacturer.

It follows from what has already been stated that if the defendant has violated the provisions of the law and if such violation proximately caused or contributed to the plaintiffs' injury, the defendant is liable to the plaintiffs in damages.

As we have said before, we have found no decided cases from any jurisdiction in which the point herein involved has been raised under the insecticide statutes. However, some light is thrown on the subject by reference to the principles of the common law. The liability of a manufacturer for injury to a third person, which injury results from the use, in a manner within the reasonable contemplation of the parties, of a manufactured product that is potentially dangerous, is based upon the principle of law that where one person is placed in such a position with regard to another that anyone of ordinary sense would know that his failure to use ordinary care and skill might cause injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger.

"* * * [A] person who knowingly sells or furnishes an article which, by reason of defective construction or otherwise, is imminently dangerous to life or property, without notice or warning of the defect or danger, is liable to third persons who suffer therefrom." 3 Cooley on Torts 467, § 498 (4th ed. 1932). Moreover, "A mere general warning of danger may be insufficient, and an insufficient warning is in legal effect no warning." *Sadler* v. *Lynch,* 192 Va. 344, 347, 64 S. E. (2d) 664.

"The common law requires a higher degree of care and vigilance in dealing with a dangerous agency than is required

in the ordinary affairs of life and business which involve small risk of injury." *American Oil Co.* v. *Nicholas,* 156 Va. 1, 10, 157 S. E. 754.

The fact that directions are overlooked or are not meticulously followed does not relieve the manufacturer of the duty to warn of latent dangers common to a class of articles. In *Maize* v. *Atlantic Refining Co.,* 352 Pa. 51, 41 A. (2d) 850, 160 A. L. R. 449, a case in which the user of a cleaning fluid died from poisoning due to inhalation of fumes in an unventilated room, the defendant strenuously contended that the label warnings which stated "Do not inhale fumes. Use only in well ventilated Place" were adequate to exonerate it from liability. The question submitted to the jury was directed specifically to the issue of adequacy of warning. The court held that it could not say as a matter of law that defendant had discharged its full duty to give adequate warning under the circumstances.

To the same effect is the case of *Farley* v. *Edward E. Tower Co.,* 271 Mass. 230, 171 N. E. 639, 86 A. L. R. 941. In this case the manufacturer gave explicit directions for the use of certain combs for hair dressing by a process known as "water waving" and in particular the container stated that the combs "were not designed to be used for the dressing of hair together with a machine that was designed to produce heat." The particular combs involved were made of a material which was likely to ignite at comparatively low temperatures. These and other directions were held not to relieve the defendant of the duty to warn of the special hazard which would follow the use of heat. In a much-quoted opinion the court stated in 86 A. L. R., at page 944: "It was a fair inference from this and other evidence in the case that, according to human experience, it was likely that the combs would be used in connection with a machine designed to produce heat unless warning of the hazard was given. The jury, therefore could have found that such use should have been foreseen by the dealer and was a natural and probable consequence of its sale of the combs without notice of their dangerous character."

See also the case of *Rosebrock* v. *General Electric Co.,* 236 N. Y. 227, 140 N. E. 571.

■ At common law the liability of a manufacturer for failure to adequately warn of the dangers incident to the use of his product does not depend on whether the injury is to the

person using the product, or to the person or object to which the product is to be applied, or to persons or things other than those to which the product is to be applied.

A typical decision imposing liability where the injury resulted to the object to which the product was applied is that in *Highland Pharmacy* v. *White,* 144 Va. 106, 131 S. E. 198. There this court held a druggist liable who sold a bottle of witch-hazel to the plaintiff for application to a cut on her thigh. The witch-hazel contained silver nitrate and as a result the plaintiff was severely burned.

In *Genesee County Patrons F. R. Ass'n.* v. *L. Sonneborn Sons,* 263 N. Y. 463, 189 N. E. 551, 553, it is said that "To hold that an owner of a building injured by an explosion * * * could recover for his personal injury but could not recover for the damage to his clothing or the destruction of his building would be anomalous. * * *

"'The general rule of law is that whoever does an illegal or wrongful act is answerable for all the consequences that ensue in the ordinary and natural course of events.' "

The pertinent provisions of the federal and Virginia Statutes in the present case are those dealing with "label," "labeling," and "misbranding." For purposes of convenience, references herein will be to the relevant sections of the Virginia Code of 1950.

Section 3-208.31(5) provides, *inter alia,* that it shall be unlawful for any person to sell within this Commonwealth any economic poison which is misbranded.

The term "economic poison" is defined as any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any insects, rodents, fungi, bacteria, weeds, or other forms of plant or animal life or viruses. Code, § 3-205.

Section 3-208.7 states that "The term 'misbranded' shall apply to any economic poison or device:

"(a) If its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular;

\*     \*     \*     \*     \*     \*

"(d) If the labeling accompanying it does not contain directions for use which are necessary and, if complied with, adequate for the protection of the public;

"(e) If the label does not contain a warning or caution statement which may be necessary and, if complied with, adequate to prevent injury to living man and other vertebrate animals, vegetation, and useful invertebrate animals;

    \*    \*    \*    \*    \*    \*

"(h) If in the case of an insecticide, fungicide, or herbicide, when used as directed or in accordance with commonly recognized safe practice, it shall be injurious to living man or other vertebrate animals or vegetation, to which it is applied, or to the person applying such economic poison, excepting pests and weeds. \* \* \*"

The term "label" is defined by § 3-208.5 as the written, printed or graphic matter on, or attached to, the economic poison or the immediate container, etc.

The term "labeling" is described in § 3-208.6 as meaning all labels and other written, printed, or graphic matter—

    \*    \*    \*    \*    \*    \*

"(b) Accompanying the economic poison or device at any time; \* \* \*."

Plaintiffs have discussed at length what they consider to be the correct interpretation of the term "labeling." This was done in support of their contention that the pamphlet which was delivered to McClanahan by defendant's salesman, Majure, was a part of the "labeling" of Tag. It will be recalled that there is a discrepancy between the label on the bottle and the aforementioned pamphlet in the caution statement having to do with the application of pest control chemicals on food crops where there is a possibility of residue remaining at harvest.

The Federal Food, Drug and Cosmetic Act and the Virginia Food Act (Code, § 3-306, *et seq.*) contain similar provisions as to labeling, except that the phrase "at any time" has been added to the federal and Virginia insecticide statutes to make clear the intention to include pamphlets and leaflets distributed separately from the containers. Even without this phrase the legislative history and judicial interpretations of the various acts have removed any doubt on the point.

In *United States* v. *7 Jugs, Etc., of Dr. Salsbury's Rakos,* 53 F. Supp. 746 (D. Minn. 1944), five printed booklets were distributed separately from the products. The manufacturer claimed they were not covered by the act. The court in denying this contention in 53 F. Supp. at page 753 states:

"Realizing that Congress was attempting to expand the protection given consumers in redefining the concept of misbranding, it is evident that the word 'accompany' should be given an interpretation which accords with the Congressional purpose. * * * 'The term "labeling" is defined so as to include not only the label but all circulars and material and placards for display purposes and the like that may in any form whatever accompany the article of food, drug or cosmetic * * *.' * * * There is nothing elsewhere in the history which in any way indicated that anything less than that was intended."

The position announced above has been emphasized in a number of federal cases. *E. g., Kordel* v. *United States,* 335 U. S. 345, 69 S. Ct. 106; *United States* v. *Urbuteit,* 335 U. S. 355, 69 S. Ct. 112; *Lee* v. *United States,* 187 F. (2d) 1005 (C. C. A. 10th 1951).

The pamphlet was left with McClanahan at the very time that he was considering what spray material to use. It alone, apart from the recommendation of defendant's salesman, told him about Tag and its uses. It contains the same "Directions for Use" that appeared on the label, and in the language of the *Urbuteit* case, 69 S. Ct., at page 113, "was designed to serve and did in fact serve the purposes of labeling."

It follows that the pamphlet must be considered as coming within the statutory definition of the term "labeling."

The trial court, it will be remembered, gave the case to the jury on the theory that the insecticide statutes require a manufacturer of an economic poison such as defendant's Tag to give a warning or caution statement which may be necessary and, if complied with, adequate to prevent injury to vegetation, etc. The jury returned its verdict for plaintiffs, because it found such warning or caution statement in the case of Tag was necessary and was not given. This verdict the trial court set aside, not because it was unsupported by substantial evidence, but on the ground that as a matter of law no warning was necessary or required by the applicable laws under the circumstances of the instant case.

The reasoning of the trial court as set out in its opinion is, in part, as follows:

(a) "It is true that the statute contemplates a warning in addition to the directions, but this warning seems to be intended

to prevent injury to persons, animals or crops other than those which are being treated.''

(b) ''The section with respect to warning seems properly to apply not to a warning of what may happen if the directions are not followed, but to incidental dangers not connected with the purpose for which the preparation is used.''

█ It becomes necessary, therefore, to determine the true import and effect of Code, § 3-208.7(e), which provides that an economic poison is misbranded unless its label contains ''a warning or caution statement which may be necessary and, if complied with, adequate to prevent injury to living man and other vertebrate animals, vegetation, and useful invertebrate animals.''

Following the passage of the federal statute, Interpretations of the Regulations for the Enforcement of the Federal Insecticide, Fungicide and Rodenticide Act were issued by the United States Department of Agriculture, Production and Marketing Administration, and Rules, Regulations and Standards were issued by the Virginia Department of Agriculture and Immigration relative to the Virginia Insecticide, Fungicide and Rodenticide Law.

Regulation 9 of the Virginia Rules, Regulations and Standards requires that the warning or caution statement ''must state clearly and in non-technical language the particular hazard involved in the use of the economic poison.'' As examples this Regulation lists ''ingestion, skin absorption, inhalation, inflammability or explosion and the precautions to be taken to avoid accident, injury or damages.''

In construing the Virginia statute, which as we have said before is almost identical with the federal statute, it is of interest to at least note some of the interpretations of the federal regulaions issued pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act, for such help as they may afford in determining the proper construction of the Virginia statute. For example, Federal Interpretation 18 relates to warning, caution and antidote statements required to appear on labels of economic poisons and provides that:[2]

''Warning or caution statements on the labels of economic poisons must give concise and easily understood warnings as to the hazards associated with the use of the products, together

[2] 7 Code Fed. Regs. § 162.116(c) (Cum. Supp. 1951).

with instructions to be followed to insure adequate protection. * * * Even if not covered in this interpretation, unique hazards associated with the use of any product—such as the possibility of injury to beneficial crops from careless application of herbicides or the destruction of beneficial insects by inopportune use of certain insecticides—must be recognized and suitable precautionary statements must be placed on the label of such product. * * *,,

In § 162.116(d) of the Federal Interpretations are given acceptable warning statements for economic poisons containing specified ingredients. As to these the Interpretations state that:

"They indicate the minimum labeling needed to bring the specified formulations into compliance with the warning, caution and antidote statement requirements of the act * * *. The manufacturer is obligated to use any added warning, caution or antidote statements which any special characteristics or uses of his formulation indicate to be necessary."

Any doubt that the administrative agency charged with enforcement of the federal law considers that the warning statements relate to all hazards, and not simply to hazards other than those to the person, crop or animal on which the economic poison is used is dispelled by the provisions of Federal Interpretation 17(d)(6) which relates to labeling of weed killers containing 2,4-D and contains this significant language:

"When recommended for use on lawns, golf courses, and pastures, the label should warn of the injury to bentgrass·and clover and damage to grass seedlings on newly seeded ground."

Here is a specific requirement of warning of a danger, not to user or to extraneous person or object, but to the object to which the economic poison is applied. And in this regard what distinction can be drawn between a lawn infested with weeds and an apple orchard infected with scab? The manufacturer of a weed killer is required, and with obvious propriety, to give warning that the grass may be injured. By the same token and with equal propriety defendant manufacturer of the scab killer Tag was required to include a warning or caution statement on the label that Tag might injure the apple trees.

Thus the language of the statutes, the intent of the legislature, and the practice of the administrative agency charged by the statute (Code, § 3-208.15) with the duty of prescribing rules, regulations and standards to be followed, demonstrate the error

in the defendant's contention that because the hazard or danger was to the apple trees rather than to the men spraying it had no duty to warn of the hazard or danger involved in using Tag.

It is our view that there is a statutory duty to warn whenever such warning is necessary to prevent injury to the objects outlined in the statute and it is immaterial whether these objects are the things being treated or whether they are the things which are injured as a result of incidental dangers not connected with the purpose for which the product is used.

The correctness of this proposition would seem to follow from a reading of the provisions of the law that require "a warning * * * which may be necessary * * * adequate to prevent injury to living man and other vertebrate animals, vegetation, and useful invertebrate animals." There is here no hint of distinction between threatened injury to user and threatened injury to the person, crop, or animal being treated. There is no indication that the legislative intent was to require, for instance, the warning actually given by defendant that Tag would burn the skin of the user, yet intended no warning or caution statement that Tag would in foreseeable instances of use burn the leaves of the trees on which it was made to be applied. It is illogical to say that the manufacturer of a spray containing a weed killer such as 2,4-D must warn of danger to the crop across the road, if the dust drifts, but need give no warning that the poison will damage the crop to which it is being applied. The language of the statute is broad and unequivocal and requires a warning or caution statement whenever necessary to prevent injury to man or animal, vegetation or useful insect.

The language of the statute being clear, there is no justification for any attempt to engraft on it such restricted meaning as the defendant would have us put on it. It was the legislative intent to protect the public against the use of harmful products, whether the harm be to the user, or person or object on which used, or strangers.

The trial court was of the opinion that the plaintiffs had failed to follow the directions provided by the defendant in their use of the Tag and it is true that the Tag was applied later than petal fall.

However, if the defendant's witnesses make the point that defoliation of the apple trees resulted from the fact that Tag was applied later than petal fall, they do so inferentially and

not directly. If we understand their testimony, they do not contend that the time of the application of Tag caused defoliation, but that it was the fact that the foliage was so badly infected with the disease that the killing of the scab also killed the leaves. Dr. Walter Reed, assistant manager of research in charge of the eastern division of defendant, was questioned, in part, as follows:

"Q. * * *Will you state what, in your opinion, based on the pictures, caused the defoliation of that orchard?

"A. *Based on the performance of the Tag Fungicide in past uses on apple trees,* it is my opinion that the defoliation such as that would have been caused by serious scab infestation. Applying any caustic or eradicator fungicide to badly infected leaves —that is, badly infected with scab—to kill out the scab which is down inside the leaves also causes some injury to leaves. That is well known, and scab leaves that are badly infected and the scab is killed out, they usually fall off." (Italics supplied).

Now, if Dr. Reed, the scientist who developed Tag, knew from past experience that if Tag were applied to trees which were badly infected with scab it would kill the leaves, is there any doubt that there was a duty on the part of the defendant to warn of this admittedly foreseeable risk?

Dr. A. B. Groves, plant pathologist for the Virginia Agriculture Experiment Station, testified for the defendant and said, in part, that "In my opinion what happened there had been a severe development of scab on the foliage and when the fungicide sufficiently potent to kill this scab was being applied there was a shock reaction which killed the leaves to a large extent as well as the fungus."

The testimony of both Doctors Reed and Groves was based on their examination of photographs of the trees after the defoliation had occurred.

As to defendant's testimony that the injury was caused by the application of Tag after the trees had become badly infected with scab, there is evidence based on the testimony of witnesses who had personally inspected the orchard, that the condition of plaintiffs' orchard in the spring of 1949 and until the application of Tag was altogether normal and that prospects for a good crop were bright. For example, W. D. Davidson, an experienced orchardist, testified that "* * * the fruit was set up good, * * * and was slight scab on the leaves of the lower limbs

* * *. It wasn't really what you would call a heavy infestation, but it was something that you could handle with ordinary sulphur like we always have, and I didn't see any scab on the fruit. * * *"

■ The defendant argues that its directions, if followed, would have assured safe use of Tag and for that reason no warning was necessary of what would happen if directions were not followed.

However, it is clear that the statutes require the manufacturer of an economic poison to give both directions for use and a warning where necessary. There is no inference that these two requirements are in the alternative, nor is there anything to suggest that a manufacturer can avoid his duty to warn or caution by giving directions for use.

The requirement that a manufacturer give adequate directions for use was placed in the statute at the same time as that of the warning. The Federal and State Regulations and the Federal Interpretations before referred to make it clear that the two requirements, while they have the common purpose of protecting the public, are intended to do so in different ways. The directions are required to assure effective use, the warning to assure safe use.

The distinction between the directions and the warning statement was clearly stated before the Agriculture Committee of the House of Representatives when that Committee was considering the draft of the present Federal Insecticide Act. (Legislative Hearings on H. R. 4851 (79th Cong.)). S. R. Newell, of the Department of Agriculture, in giving a synopsis of the proposed bill, stated at page 3 as follows:

"The requirement that instructions for use must accompany the article is important because in the past fraudulent preparations have been able to circumvent legal requirements by not putting directions for use on the label. * * * The provision relative to injury to man or other animals (the warning section) is necessary to protect against the use of harmful products."

That the directions for use are required to assure effective use is further shown by Regulation 20 of the Virginia Rules, Regulations and Standards heretofore referred to.

"Regulation 20. The physical properties of an economic poison shall be such that the economic poison is effective when used according to directions given in the labeling, or if no

directions are given when used in accordance with common practice."

It follows then, that a manufacturer of an economic poison in giving directions for use is fulfilling only a part of his obligation to the purchaser. He is saying simply "Here is a way to use this product which we guarantee will kill the weeds infesting your lawn or the scab infecting your orchard." Of course, that way must be a safe way. The manufacturer by instructing how to use is not necessarily saying, nor is he understood by the purchasing public to say, "This is the only safe way to use our product."

The position taken by the defendant leads to the conclusion that if the directions are not followed, it is not responsible for damage to the apple trees caused by the application of Tag. However, aside from the provisions of Code, § 3-208.7(e), (which requires a warning or caution statement where necessary) Code, § 3-208.7(h) makes it perfectly clear that the defendant can be held liable for damages even if directions are not followed. This section provides that a fungicide is misbranded if "when used as directed *or* in accordance with commonly recognized safe practice it shall be injurious to * * * vegetation * * * to which it is applied, or to the person applying such economic poison. * * *" (Italics supplied). If the defendant's interpretation is correct, the provision of this section relative to commonly recognized safe practice is rendered meaningless. This provision may lead to liability in a situation where directions are not followed, if the economic poison has been used in accordance with commonly recognized safe practice.

The jury was further instructed that "if they believe from the evidence that Tag was applied to the plaintiffs' orchard by Roy McClanahan, their agent, at a time when he knew, or, in the exercise of ordinary care, should have known that the injury might result, then they were guilty of contributory negligence and you must find for the defendant."

While this instruction does not use the language of Code, § 3-208.7(h) in the manner that the other instruction previously quoted did in reference to Code, § 3-208.7(e), it, along with the other instructions in the case, fairly submitted to the jury the question whether the plaintiffs had followed commonly recognized safe practice in their application of Tag.

Commonly recognized safe practice is that practice which

prevails generally in the area as known to and practiced by experienced orchardists. The plaintiff, McClanahan, an experienced and successful orchardist, had been in the apple business some twenty years, and co-plaintiff, Detamore, was also an experienced orchardist. They exchanged information and the results of experience with other orchardists; they attended meetings dealing with orchard matters regularly; they subscribed to technical services, notably, that provided by the Virginia Polytechnic Institute.

In this connection, one of the exhibits in the case, a postal card dated May 4, 1949, and headed "Cooperative Extension Work in Agriculture and Home Economics, U. S. Department of Agriculture and State Land-Grant Colleges Cooperating" stated that the time for the first cover spray for apples for the 1949 season was the period May 9-15. It has already been pointed out that Tag was applied during the period May 11-13.

The evidence is clear that plaintiffs used the utmost care in mixing and applying the spray, in cleaning the containers, and generally in their operations. There is nothing to suggest that the customary high degree of care followed in these respects was ignored with respect to the timing of the operations, in so far as they were guided by the commonly recognized safe practice in their locality.

As orchardists they knew their business and knew how and when to spray. During early 1949 they had followed the regular program for controlling scab that was customary in their locality. They were not chemists and could not be expected to know the peculiar properties of phenol mercuric acetate, nor were they apprised of these properties in any way whatsoever. As orchardists familiar with scab control, they followed commonly recognized safe practice in applying a corrosive spray as a first cover spray. Liquid lime sulphur is such a spray, id est, it is both a protectant and an eradicant. Dr. Reed conceded that Tag was considered to be similar to liquid lime sulphur. When asked how liquid lime sulphur compares with mercury base sprays, he stated:

"It performs the job in the same fashion. Comparing the two sprays, the mercury base sprays have generally been shown to be more effective in killing scab than has the liquid lime sulphur and also to be somewhat safer to the trees."

Bulletin 131 (revised February, 1949) entitled "Information

for Virginia Fruit Growers 1949'' and distributed by the Extension Service, Blacksburg, Va., in its apple spray program No. 1, lists lime sulphur as one of the recommended materials for use during the first cover spray.

It is to be remembered too, that several of defendant's representatives were in the orchard while Tag was being applied, but it apparently did not occur to them that the spray was being applied at the improper time.

In light of the evidence the jury was warranted in finding that the plaintiffs' use of Tag coincided with commonly recognized safe practice.

The defendant further contends that "Plaintiffs in using spray against directions thereby assumed the risk and proximately caused or contributed to the injury complained of.''

To discuss this question in detail would require that considerably more be added to an opinion already long. Once the question of the duty to warn has been determined, this question is simplified, if not settled. The issue having been submitted to the jury and resolved by them in favor of the plaintiffs, it must stand, if the verdict is supported by the law and the evidence. This is not a case of a plaintiff having acted in defiance of a warning. Here there was no warning. Where there is a duty to warn and the defendant fails to give the required warning, there is no assumption of risk. *Clinchfield Coal Corp.* v. *Ray*, 121 Va. 318, 93 S. E. 601. See also *Alexander* v. *Wrenn*, 158 Va. 486, 164 S. E. 715. In its discussion of this question, the defendant reargues much that was said with reference to the duty to warn. Therefore, the cases heretofore cited are pertinent on this question.

Defendant says, ''If a recovery were permitted here it would be precedent for recovery in any case where injury resulted from the use of the article in any way or under any circumstances which the instructions or directions did not specifically forbid.'' This is a contention that there would have to be a warning against all hazards. This, of course, is not correct. Defendant's duty to warn does not extend to circumstances and conditions which it could not have reasonably anticipated.

In the light of the jury's verdict for the plaintiffs, which indicates a finding that under the circumstances of this case a warning was necessary and that the plaintiffs had followed

commonly recognized safe practice in applying Tag; and, in view of the law applicable to the facts, it follows that the judgment of the trial court must be reversed, the verdict of the jury reinstated, and final judgment here entered thereon for the plaintiffs.

*Reversed and final judgment.*

BUCHANAN and WHITTLE, JJ., concur in result.

EGGLESTON and SPRATLEY, JJ., dissenting.

BUCHANAN, J., concurring in result:

As I understand this case, the question involved is whether the defendant failed to comply with the label and labeling sections of the Virginia Insecticide, Fungicide and Rodenticide Law, found in Title 3, Chapter 12 of the Code.

That law, in section 3-208.7 of the Code, requires that the labeling accompanying the poison (which included the pamphlet in evidence here) contain directions for use necessary and adequate for the protection of the public; and that the label on the bottle shall contain a warning necessary and adequate to prevent injury to man, vegetation and certain animals.

The court instructed the jury that in order for the plaintiffs to recover they must establish by a preponderance of the evidence that the label on the bottle did not contain a warning statement necessary and adequate to prevent injury to the orchard, and that as a consequence the injury resulted.

The jury found that necessary and adequate warning had not been given and I agree with the conclusion that the evidence was sufficient to support their verdict. No question is raised as to the amount of the verdict.

As pointed out in the majority opinion, the "directions for use" in the label on the bottle and in the pamphlet were identical. Those directions, as is patent from reading them, are hardly more than suggestive, certainly they are not explicit, as to the time for using the spray. There is nothing in the directions to indicate that harm would result if the spray was applied after the petal fall spray.

In the pamphlet, which was the first thing given to the plaintiffs to read, was the caution, "Do not use this product on bearing apple trees later than two weeks following petal fall or the first cover spray, whichever comes first." The plaintiffs'

evidence is explicit, and without contradiction, that the petal fall spray was applied April 28 and the spraying with Tag was begun May 11, within the two weeks, and before the first cover spray. The caution on the label, however, read: "Do not use this product on bearing apple trees later than petal fall." This conflict in cautions could hardly be said to constitute necessary and adequate warning.

However, the testimony for the defendant is positive, as was its answer to interrogatories, that these cautions related only to the possibility of residue remaining on the fruit at harvest, and were not intended as any warning of what might happen to the trees if applied later.

In addition, the evidence shows that the spray was recommended to the plaintiffs for use at the time they used it, and a vice-president of the defendant company visited the orchard while the spraying was being done (he said on May 18) and gave no indication that any injury might be expected from the spraying at that time, but advised, according to plaintiffs' evidence that another application be made.

Moreover, defendant's assistant manager of research, the man who developed this fungicide, testified that he was surprised at the result, because he had never heard of anything like it before and "We didn't feel it was necessary to give such a warning." He insisted that the defoliation was not due to the spray but to the disease that the spray was meant to eradicate.

To the plaintiffs this was a new product. They did not know and were not warned of the dangers of its use when applied at the time they applied it. The defendant should have known of that danger. On the evidence the jury had a right to say that a warning was necessary, that none that was adequate had been given and that the defendant should be held liable for the damages resulting from its breach of the duty placed upon it by the statute.

WHITTLE, J., joins in this opinion.

SPRATLEY, J., dissenting.

It seems to me that this would be a perfectly plain case if we do not commence by confusing our minds with a lot of questions not pertinent to the controlling issue. My study of the record convinces me that the judgment of the lower court should be

affirmed for substantially the reasons given in its written opinion. The difficulty the majority had in reaching its conclusion is manifested in their analysis of and reliance upon isolated statements from that opinion, rather than upon a consideration of the whole.

The pertinent facts are few and simple. Plaintiffs purchased a spraying material known as "Tag" for use in their orchards. "Tag" is a fungicidal liquid containing organic mercury, a poison. It is manufactured by the defendant and distributed in bottles. State and Federal statutes require that the label on such bottles and other printed matter accompanying the poison shall contain both "directions for use which are necessary and, if complied with, adequate for the protection of the public," and "a warning or caution statement which may be necessary, and, if complied with, adequate to prevent injury to living man and other vertebrate animals, vegetation, and useful invertebrate animals."

The label attached to each of the bottles of "Tag" reads, so far as is pertinent to the issue involved, as follows:

"O                              O
          POISON
    X                              X
"WARNING TO USER: DON'T KEEP POISONS
    WHERE FOOD IS HANDLED OR STORED
        AVOID FOOD CONTAMINATION
        ANTIDOTE: * * *
        INTERNAL: * * *
            KEEP FROM FREEZING

"Tag Fungicide No. 331 is a fungicidal liquid containing organic mercury. It mixes readily with water for spray applications for both the protective and after infection control of apple scab. It is for use during the early season period from delayed dormant through petal fall spray. Note Caution.

### DIRECTIONS

"Use Tag Fungicide No. 331 at the rate of * * *. Tag Fungicide No. 331 may be combined with lead arsenate, hydrated lime, DDT, benzene hexachloride, tetraethyl pyrophosphate etc.

"* * * This dosage should be increased to ½ pint whenever it is likely that scab infections have occurred following pro-

longed periods of rain. Consult your local agricultural authority for correct time for scab sprays in each locality.

"CAUTION: Contact of the undiluted Tag Fungicide No. 331 with the skin and eyes will cause irritation and severe burning and blistering of the skin. Wash off with plenty of water immediately. For eyes, get medical attention. Flush skin or eyes with water for 15 minutes.

"Various restrictions have been placed on the use of poisons on food crops where there is a possibility of residue remaining at harvest. Do not use this product on bearing apple trees later than petal fall.

"NOTICE: The use of this material being subject to conditions beyond their control, neither California Spray-Chemical Corporation nor the seller makes any representation or warranty, express or implied, with respect to results from such use, whether or not used in accordance with directions. The buyer accepts and uses this material subject to these terms and shall not hold either California Spray-Chemical Corporation or seller liable for the results of any use of this material. * * *''

The defendant, in marketing its product, "Tag," distributed a pamphlet, which set out the ingredients of the preparation, the purpose for which it could be used, directions for its use, and caution as to use. It also contained this notation: "(Note Label Directions and Caution.)" The "Directions For Use" on the label were identical with those on the pamphlet. The warning or "Caution" statement on the pamphlet was the same as that on the label, except for the last sentence, which read: "Do not use this product on bearing apple trees later than two weeks following petal fall or the first cover spray, whichever comes first."

No question is raised as to the sufficiency of the directions. It appears that plaintiffs paid no attention to any of the statements upon the pamphlet, but relied, they say, upon those on the label. According to their own testimony, however, they did not follow the directions or obey the warnings either on the pamphlet or the label as to time of application. They used "Tag" on their bearing apple trees "later than two weeks following petal fall." There was no evidence that they were misled by the terms of the pamphlet or label, into applying the spray at a time later than that prescribed by the directions, and no adequate explanation of why they did so.

Expert witnesses testified on behalf of the defendant, without contradiction, that if "Tag" had been used at the time specified by the directions, it would not have caused any damage to plaintiffs' trees. They explained that the operation of the preparation on the infested foliage caused the leaves to drop; but if it had been used at the time directed the essential foilage would not have been affected because it had not then "put out."

In this situation, the facts present but the single, narrow issue: Did the defendant fail to label its product in conformity with the requirements of the statutes, that is, give a warning which, if it had been complied with, was adequate to prevent injury to plaintiffs' trees? The answer, I think, should be in the affirmative.

In an effort to escape the consequences of their folly in not following the directions, plaintiffs contended that it was the duty of defendant "to warn or caution them of unusual hazards or danger that should be reasonably anticipated from the use of "Tag," and, more specifically, that the preparation should not be applied "after scab has gotten well started on the trees." Some emphasis is placed upon the specification "unusual hazards or danger." In ordinary acceptation, the word "unusual" means "uncommon," and it can hardly be said that an uncommon happening is to be reasonably anticipated. As experienced orchardists, plaintiffs knew that "Tag" contained poisonous ingredients, which would chemically produce an injurious or deadly effect upon objects exposed to it. They must have known that unless the directions were followed and the warning obeyed, exposure to the preparation would result in damage to their trees.

The positive prohibition: "Do not use this product on apple bearing trees later than petal fall," was a warning as to all hazards, usual or unusual, if used later than the specified time. Since the plaintiffs used it "later than two weeks following petal fall or the first cover spray," the difference between the warnings on the label and the pamphlet is inconsequential.

We are not told how it could be determined when "scab has gotten well started," nor the proper degree of such infection. Both the directions and the caution statement clearly define the limitation of time for the application of the preparation. According to the record, the crop producing leaves could not have been injured within the period of limitation for application of the

spray, because they do not "put out" before petal fall. Plaintiffs, as experienced orchardists, admittedly knew the time of petal fall.

There appears some contradiction between the plaintiffs and the majority of the court as to whether there was a heavy infestation of scab at the time "Tag" was applied. The record shows that "Tag" was sprayed on the trees beyond the period of limitation prescribed for its application and at a time when there was a heavy infestation of scab. This supports the theory of the plaintiffs as to the condition of scab infestation. In the court's opinion it is said: "There is evidence presented in testimony of witnesses who had personally inspected the orchard that the condition of plaintiffs' orchard in the Spring of 1949, and until the application of "Tag" was altogether normal. * * * there was slight scab on the leaves of the lower limbs. * * * There wasn't really what you would call heavy infestation."

This brings us to a consideration of the sufficiency of the caution or warning statement. As the trial judge observed, the limitation of time with respect to the use of the spray is stated three times on the label. First it says that "Tag" "*is for use during the early season period from delayed dormant through petal fall spray. Note Caution.*" In the "DIRECTIONS," it is stated that it is to be "*applied in the pre-blossom and petal fall spray applications.*" The "CAUTION" statement contains this warning: "*Do not use this product on bearing apple trees later than petal fall.*" (Italics added.) All of the sophistry of the most eminent pleaders cannot change the meaning of the warning one whit.

The prohibition as to application "later than petal fall" was positive, simple and direct. It could serve no purpose other than to warn of danger upon violation, a warning with special meaning to experienced orchardists who know the condition of the foliage on their trees at the time of petal fall. No additional warning was necessary under the statutes. To say that there should have been added a statement "Use only as directed, and not otherwise, or damage may result," is a reflection upon the intelligence of the plaintiffs.

Nor do I think that, under the circumstances here, there was established a "commonly recognized safe practice" for the plaintiffs to follow in applying "Tag." In the first place, "Tag" was a new discovery and was being used, so far as the plaintiffs

knew, for the first time in Virginia. Moreover, no "commonly recognized safe practice" should be followed in the face of positive directions to the contrary.

In my opinion, the verdict of the jury is contrary to the law and the evidence. I cannot bring myself to assent to a recovery by the plaintiffs where the undisputed evidence shows that they brought the damage upon themselves, either through negligence or by a wilful disobedience of directions and warnings. It having been established that no injury would have been incurred by plaintiffs had they observed the directions and caution statements on the label of "Tag" and the accompanying pamphlet, it must logically follow that their default was a proximate cause of the damage occasioned them. There is a question of the wisdom and fairness of subjecting defendant to liability for damages under such circumstances. The majority opinion fashions a broad, new law of negligence in conflict with that which we have followed for many years,—one apt to cause embarrassment in the future.

EGGLESTON, J., concurs in this dissent.