Christ **KALOPODES**, Administrator of the Estate of George A. Kalopodes, deceased, Appellee,

v.

**FEDERAL RESERVE BANK OF RICH-MOND**, Appellant.

No. 9744.

United States Court of Appeals Fourth Circuit.

Argued March 5, 1965.

Decided Sept. 12, 1966.

M. Wallace Moncure, Jr., Richmond, Va. (Moncure & Cabell, Richmond, Va., on the brief) for appellant.

James M. Minor, Jr., Richmond, Va. (Joseph B. Bennedetti and Minor, Thompson, Savage, White & Smithers, Richmond, Va. on the brief) for appellee.

Before HAYNSWORTH, Chief Judge, and BOREMAN and BRYAN, Circuit Judges.

HAYNSWORTH, Chief Judge:

George Kalopodes was fatally injured when, at the fifth floor level and in almost complete darkness, he stepped into the ventilating shaft through which air is supplied for air conditioning the building of the Federal Reserve Bank of Richmond. His administrator recovered a verdict in an action for wrongful death, and the Bank has appealed from the judgment, entered on the verdict, contending that the jury could not reasonably have found that Kalopodes was free of contributory negligence.

We think the District Court properly held that it was a question for the jury.

Some understanding of the physical conditions is necessary to an understanding of the problem.

Air is inducted into the Bank building's ventilating system through five copper louvered windows in the south, or Franklin Street, face of the building, one being at each floor level at the second through the sixth floors. Over a period of years, moisture dripping from the copper louvers had discolored stone in the face of the building. In order to remedy that condition, the Bank contracted with N. W. Martin & Brothers, the employer of Kalopodes, to install troughs and drains beneath each of the louvered windows to carry off the copper-stained condensation, preventing its coming in contact with the face stone below. This work required internal access to the louvered windows.

A vertical air shaft runs from the second floor to the roof above the sixth floor. The south wall of the air shaft is not adjacent to the south wall of the building, however, but is separated from it by the third stage of a U-shaped plenum,[1] providing a passageway at each floor level. The third stage of the plenum is the left arm of the U; its second stage, the base of the U, runs along the east wall of the air shaft, while its first stage, the right arm of the horizontal U, runs along the north wall of the shaft.

To reach the copper-louvered intake vents from the interior of the building at any floor level, one must negotiate the plenum's passageway. On the fifth and lower floors, a narrow door gives access to the plenum's first stage. From there, one must proceed to his left until he reaches a facing, sheet metal bulkhead through which a narrow door provides access to the plenum's second stage along the east wall of the air shaft. After

---

[1] On the sixth floor, the plenum is a square, entirely surrounding the air shaft. On the other floors, the plenum has but three sides.

passing through that door, one must turn to his right and proceed some ten to fifteen feet along the second stage until another facing bulkhead is reached through which another narrow door provides access to the plenum's third stage and the intake vent for that floor.

The plenum is unlighted. There are no electrical connections in it, though some natural light enters the third stage through the copper louvers, and, when the access door to the first stage is open, light from the adjacent room may enter.

In the sheet metal wall of the air shaft, there are louvered openings permitting an exchange of air between the shaft and the plenum, particularly the movement of air through the louvered windows in the south face of the building through the third stage of the plenum and into the vertical air shaft.

At each floor level, there is also a door in the wall of the air shaft, through which one may enter from the plenum into the shaft itself, though the shaft is unfloored except at its bottom. On the second, third and fourth floors, the door into the shaft is in the first stage of the plenum where it was unlikely to be confused with the door giving access to the plenum's second stage and where there would usually be the benefit of some illumination through the open access door for the first stage of the plenum.

On the fifth floor, however, the door into the shaft was located in the second stage immediately adjacent to the door between the first and second stages of the plenum and in the same plane. The two doors, side by side, are identical when closed, though the door into the shaft opens westwardly while that between the two stages opens eastwardly.

Thus, on a return journey through the plenum, nearing the end of the second stage, one would come to two identical doors, the first of which, when opened by pushing would lead him into the air shaft, the second of which, when opened by pulling, would lead him safely into the first stage of the plenum.

The door into the air shaft had no lock on it. It was secured in no way. It had the same kind of handle as the other door. It was a lethal trap for one groping through the darkness of the plenum's second stage. Kalopodes fell into it.

Kalopodes left his two fellow workers in the third stage of the plenum on the fifth floor on a mission of his own. They had entered with a flashlight and a long extension cord with two sockets, one for a light bulb and another for an electric drill. Kalopodes might have taken the flashlight with him on his return journey, but he did not. He did not expect to return immediately, and, apparently, he felt confident he could negotiate the plenum's second stage on the fifth floor as he had on the floors below. Unaware that on the fifth floor there were two identical doors, side by side, he opened the first one, stepped into the air shaft and fell to his death on the bottom of the shaft, three floors below.

Kalopodes and his two fellow employees of N. W. Martin & Brothers were not entirely unwarned about doors into the air shaft. Wicker, the foreman of the three-man crew, testified that he had been told that there were doors opening into the shaft and to be careful to notice the differences in the construction of the plenum at the sixth floor level. He testified that he had told Smith and Kalopodes of the existence of such doors. Smith confirmed the fact that he had been told of them. Indeed, he had observed such doors on the second and third floors, located in each instance, in the plenum's first stage where it was not likely to be confused with the door, in a different plane, giving access to the second stage of the plenum. Smith testified he did not know whether such doors could be opened, and he and Wicker testified that the door in the shaft on the fifth floor had not been seen or noticed until after Kalopodes had fallen.

Pierce, an employee of the Bank, testified that he told Wicker to be careful, to light the way ahead and behind and, if possible, to go in and out together.

He testified he also told Wicker to check each floor to see if there were any differences, calling his particular attention to the sixth floor where the plenum had a fourth stage.

Nicholson, another employee of the Bank, testified he had been present when Pierce told Wicker to be careful. According to Nicholson, Pierce had told Wicker "the doors to the air shaft were different on different floors," that he should always have a light with him and another man, that he should not "back through a door," and that, when opening a door, he should "make sure what is on the other side before you step in."

Nicholson's version of Pierce's warning is more specific than Pierce's, but even it does not contain a specific warning of the highly confusing and dangerous arrangement of the doors on the fifth floor in the plenum's darkest second stage.

■ It was for the jury to determine from these conflicting versions [2] exactly what was said. They could have accepted Wicker's version of the warning. They could have accepted Pierce's testimony, which differed from Wicker's only in its advice that certain precautions should be employed. As a description of the extraordinary danger in the second stage of the plenum on the fifth floor, it added nothing to Wicker's version that he had been told there were doors into the shaft and to be careful to observe the different arrangement of the plenum on the sixth floor. Indeed, Pierce corroborated Wicker's testimony about a special caution directed to the sixth floor. He testified to no statement that would suggest that the men would encounter a hazard on the fifth floor that did not exist on the third. The jury could, of course, have accepted Nicholson's testimony. If we should assume that it did we would have a closer case, but, on appeal, we must assume that the jury resolved these factual differences in a manner most favorable to the verdict.

■ As an employee of an independent contractor, Kalopodes was an invitee while on the Bank's premises.[3] Under Virginia law, an owner has a duty to warn invitees of latent dangers on his premises.[4] And an invitee is not contributorily negligent for not being on the lookout for something about which he has not been warned.[5] The sufficiency of the warning depends upon such factors as the intelligence and experience of the invitee and the nature of the danger.[6] A general warning of danger may be insufficient,[7] and an insufficient warning has the same legal consequences as no warning at all.[8]

■ A question of sufficiency of a warning is normally a jury question.[9] In order to take the question from the jury the facts must so preponderate on

---

2. The Bank suggests that its testimony was uncontradicted. This is because Wicker, when asked if Pierce had told him to have a light with him at all times and to go in and out together, responded that he did not remember any such statements having been made to him. That is a denial, notwithstanding his response of "No, sir," to the cross-examiner's inquiry, "But you do not deny those statements." As noted in the text, too, there are differences in the Bank's own testimony.

3. See Glasscock v. United States, D.C., 207 F.Supp. 318, aff'd, 4 Cir., 323 F.2d 589. Moreover each of the three workmen had individual passes to enter the bank's premises.

4. Crocker v. WTAR Radio Corp., 194 Va. 572, 74 S.E.2d 51 (1953); Knight v. Moore, 179 Va. 139, 18 S.E.2d 266 (1942).

5. Montgomery Ward & Co. v. Young, 195 Va. 671, 79 S.E.2d 858 (1954); Raylass Chain Stores, Inc. v. De Jarnette, 163 Va. 938, 178 S.E. 34 (1935); Eastern Shore of Virginia Agricultural Ass'n v. Le Cato, 151 Va. 614, 144 S.E. 713 (1928).

6. Sadler v. Lynch, 192 Va. 344, 64 S.E.2d 664 (1951).

7. Spruill v. Boyle-Midway, Inc., 4 Cir., 308 F.2d 79; Sadler v. Lynch, supra note 6.

8. Sadler v. Lynch, supra note 6.

9. Spruill v. Boyle-Midway, Inc., 4 Cir., 308 F.2d 79; McClanahan v. California Spray-Chemical Corp., 194 Va. 842, 75 S.E.2d 712 (1953).

one side that conflicting conclusions or inferences may not be drawn from the evidence.[10]

■ Under these standards, an inference that the warning was inadequate was clearly permissible, if not compelled. Very general warnings of doors opening into the shaft, doors which constituted no particular peril on the floors where the men were to work first, coupled with an admonition to notice the different arrangement of the sixth floor plenum, was not calculated to inform the men of the extremely deceptive arrangement of the doors on the fifth floor and the necessity for more and different precautionary measures than had been found requisite on the other floors they had worked.

■ In a context of obvious danger, a general warning may suffice to discharge a landholder's duty to his invitee. A warning to stay away from a crane, when high voltage power lines constitute an obvious hazard, may be enough to insulate one from liability,[11] but a warning to be alert to unparticularized danger is not. A shout of "heads up" to a pitcher in a "bull pen" may unerringly alert him to the peril of a fly ball, but a warning that there are doors into an air shaft, after observation of such doors in innocuous locations, is no warning of deceptive arrangements of such openings in other locations.

■ It was for the jury to say, in light of the varying versions, what warning was given and to determine its adequacy.

On this appeal, the Bank does not contest the finding of its negligence. It wisely concedes the issue. The testimony discloses no need for these doors into the air shaft. In twelve years, they had not been used. If design engineers envisioned some extraordinary circumstances which would make them useful, there is no suggestion of justification for the arrangement on the fifth floor. Nor is it contended that the fifth floor door into the shaft should not have been secured by a lock or hasp, splashed with red paint, removed from doors workmen would be required to use, or otherwise rendered inoperative in the presence of workmen on the fifth floor, who otherwise, might be entrapped, as Kalopodes was, into a serious or fatal misstep.

■ The contention on appeal is that the jury could not reasonably have found that Kalopodes was free of contributory negligence, and the Bank was entitled to a directed verdict on that ground. Specifically, it is said that he was negligent in leaving his two fellow workers and proceeding alone without a flashlight back through the plenum. Whether he was or not was a matter properly for the jury to determine.

■ If Kalopodes had used the flashlight, he might have discovered that there were two doors. He probably would not have stepped through the first one. That does not answer the question, however. The question is whether, under those circumstances, a man of ordinary prudence would have undertaken to go back through the plenum without the flashlight.

In appraising this question we must have the warning in mind, accepting, as we have said, the version most favorable to the verdict.

Kalopodes knew there were some openings into the shaft. He had seen them in innocuous locations on lower floors. He did not know, and, from all that appears from this record, he had no reason to suspect, that there was a door into the shaft from the second stage of the plenum on the fifth floor and located immediately adjacent to the door to the first stage through which he intended to pass. He had passed through the second stage with the others and the light, going in the opposite direction to-

10. Smith v. Virginia Elec. Power Co., 204 Va. 128, 129 S.E.2d 655 (1963); Nehi Bottling Co. v. Lambert, 196 Va. 949, 86 S.E.2d 156 (1955).

11. Sadler v. Lynch, 192 Va. 344, 64 S.E.2d 664 (1951).

ward the window, and may reasonably have assumed that he knew the condition of the floor and could safely make his way to the first stage without a light. Having worked in the lower floors, the plenum by that time may have seemed to him a familiar and comfortable thing. In the absence of any warning that the fifth floor was dangerously different from the other floors on which he had worked, reasonable men might conclude that his conduct was not negligent. As Wicker testified, explaining that he did not always use the flashlight, he had become sufficiently familiar with the plenum that "I figured I didn't need any light."

When one proceeds in darkness in the face of hazards he should reasonably expect to encounter, Virginia, in several cases, has held it to be negligence as a matter of law: Thus, when a passenger, who had alighted from a train, wandered from the waiting room onto the elevated platform, unlighted while the lamp was being trimmed, and fell, she was held to have been contributorily negligent.[12] A guest in a Victorian, seaside hostelry should expect stairways leading from the corridors, and one who undertook to go to a bathroom down an unlighted corridor without having requested a light was held to have negligently contributed to her own injury when she fell down a stairway.[13] Similarly, a motorist, looking for a restroom in a gasoline station, without having inquired about its location, was held to have been negligent when he proceeded into an unlighted room and fell into a grease pit.[14] Finally, it was held that a householder, who responded to a knock he thought was on his rear entrance door with a "Come in," was no more at fault than the caller, who had actually knocked on the cellar door and who, acting upon the supposed invitation, opened the cellar door and proceeded in darkness to fall down the cellar stairway.[15]

A reasonably prudent person should expect a grease pit in a service station, an abrupt end to elevated platforms at railroad stations, stairways in rambling, turn-of-the-Century hotels, and a cellar stairway near the rear entrance to a residence. But without any warning of it, a reasonable man might not anticipate that a door leading to almost certain death would be left, unlocked, unbarred, unmarked and located in an unlighted area immediately adjacent to an identical door through which an invitee was expected to pass. The degree of the defendant's culpability and the magnitude of the hazard and its relative prevalence are all relevant to an appraisal of a plaintiff's duty to anticipate the peril.

There is a substantial difference in proceeding blindly into an unlighted area with which one is unfamiliar, but in which certain hazards are commonly encountered, as the plaintiff in each of these Virginia cases did, and proceeding into an unlighted area with which one is sufficiently familiar to entertain a reasonable belief that he is aware of all existing hazards and can avoid them.[16]

Under all of the circumstances, Kalopodes' neglect was not so certain that reasonable men might not find him innocent of it.

The question, we conclude, was one for the jury. It was properly submitted to them, and judgment for the plaintiff was properly entered on the verdict.

Affirmed.

12. Reed v. Richmond & A. Ry., 84 Va. 231, 4 S.E. 587 (1887).

13. Baker v. Butterworth, 119 Va. 402, 89 S.E. 849 (1916).

14. Smith v. Wiley-Hall Motors, Inc., 184 Va. 49, 50, 34 S.E.2d 233 (1945).

15. Clark v. Fehlhaber,, 106 Va. 803, 56 S.E. 817, 13 L.R.A.,N.S., 442 (1907).

16. See Knight v. Fourth Buckingham Community, 179 Va. 13, 18 S.E.2d 264 (1942).