Roy F. KING, Jr., et al.,
Etc., Plaintiffs,

v.

ISLAND CREEK COAL COMPANY,
Defendant.

No. 1:03CV00040.

United States District Court,
W.D. Virginia,
Abingdon Division.

Oct. 19, 2004.

---

Annesley H. DeGaris, Cory, Watson, Crowder & DeGaris, Birmingham, AL, and Gerald L. Gray, Gerald Gray Law Firm, Clintwood, VA, for Plaintiffs.

Stephen M. Hodges and Eric R. Thiessen, Penn, Stuart & Eskridge, Abingdon, VA, for Defendant.

## OPINION

JONES, Chief Judge.

In this wrongful death case based on the Virginia law of negligence, the deceased was killed in a workplace accident. While the accident occurred on the defendant coal company's property, the deceased was not an employee of the defendant. The defendant has moved for summary judgment in its favor as to liability. I find that under the facts of the case the defendant breached no legal duty of care to the deceased and thus grant the motion.

I

The deceased, Charles Dan Cottingham, died on September 19, 1999, near Oakwood in Buchanan County, Virginia, while working for his employer, Dixie Railway Services, Inc. ("Dixie"). At the time of the accident that killed him, Cottingham was helping to unload pieces of machinery called "power assemblies" from a flat bed truck. The power assemblies were to be used to repair two rail locomotives that formerly had been owned by the defendant Island Creek Coal Company ("Island Creek"), and were still located on its property near a closed coal mine called Virginia Pocahontas 1 ("VP–1"). Unknown to Island Creek, Dixie had purchased the locomotives from another company that had earlier bought them from Island Creek, and Dixie wanted the locomotives repaired so that they could be moved.

While attempting to place a hook on one of the power assemblies in order to allow it to be lifted from the truck to the ground by a crane operated by a fellow employee, Cottingham lost his balance. Falling backwards off of the truck, Cottingham inadvertently pulled two of the power assemblies with him. One of the pieces of machinery struck Cottingham in the head, killing him instantly.

As a result of the accident, this wrongful death action was brought against Island Creek by Cottingham's estate administrators.[1] The plaintiffs claim that Island Creek is liable in damages, both compensatory and punitive, because it did not comply with regulations of the federal Mine Safety and Health Administration ("MSHA") promulgated pursuant to the Mine Safety and Health Act of 1977 ("Mine Act") and because its failure to comply caused Cottingham's death. The plaintiffs and the defendant have moved for summary judgment in advance of trial. The plaintiffs contend that the only question for trial is damages and Island Creek argues that it is entitled to judgment in its favor as to its liability. The motions have been fully briefed and argued and are thus ripe for decision by the court.[2]

## II

As shown by the summary judgment record, the facts surrounding the accident and the relationship of the parties are generally uncontested.

MSHA conducted an investigation of Cottingham's death shortly after it occurred, and in its report, MSHA summarized the facts as follows:

Island Creek Coal Company's Virginia Pocahontas 1 mine is located four miles west of Oakwood, Virginia off state route 638. The mine has no production; it was placed in an active, non-producing status on May 19, 1994.

On December 7, 1998, Doucett's Diesel Service, Inc. of Sunset, Louisiana made an offer to purchase from Island Creek Coal Company, two railroad locomotives (No. 1493 and 1496) located on the upper rail yard of the Virginia Pocahontas 1 mine. The purchase was finalized on January 13, 1999. Doucett's Diesel Service, Inc. is owned jointly by Danny Doucett and Steve Plant. Steve Plant also owns Plant Rail Car. Steve Plant contacted Turner Locomotive, a railway vehicle broker, for the sale of the two locomotives. Marty Turner, operator of Turner Locomotive, sold the numbers 1493 and 1496 locomotives to Dixie Engine and Equipment of Cropwell, Alabama. Shortly thereafter Dixie Engine and Equipment changed the company name to Dixie Railway Services, Inc. On August 6, 1999, Railserve of Atlanta, Georgia acquired Dixie Railway Services, Inc.

Dixie Railway Services, Inc. continued to operate under a separate corporate structure as one of six subsidiaries of Railserve. Dave Zuspan, general di-

---

1. Jurisdiction of this court exists pursuant to diversity of citizenship and amount in controversy. *See* 28 U.S.C.A. § 1332(a) (West 1993 & Supp.2004). Cottingham was a resident of Alabama at the time of his death and this action was filed in the United States District Court for the Northern District of Alabama by Roy F. King, Jr., the Estate's Alabama administrator. The case was thereafter transferred to this court and Thomas L. Pruitt was added as the resident Virginia ancillary administra-

tor. The addition of the resident administrator does not destroy diversity jurisdiction. *See id.* § 1332(c)(2) (West 1993).

2. The parties have filed and briefed a number of other pretrial motions, but because of my resolution of the summary judgment motions, it is not necessary for me to rule on these other motions.

rector mechanical, of Dixie Railway Services, Inc. contracted Don Adams of Don's Railway Services, Danville, West Virginia for the purpose of repairing and maintaining the locomotives to a standard acceptable to the Federal Railroad Administration for towing on mainline railroads. The original intent was to have the Norfolk Southern Railway pull the locomotives to a specific destination of sale. Don's Railway Service employees began work on the locomotives on July 20, 1999. They worked on the wheels, railings, steps, etc. on an intermittent basis until September 17, 1999. Meanwhile, Dixie Railway Services, Inc. had contracted delivery of the No. 1493 locomotive to a firm located in Marysville, Ohio. The No. 1493 was to be roadworthy and have full engine power upon delivery on October 4, 1999. This necessitated that work be done on the locomotive's diesel engine.

Two employees of Dixie Railway Services, Inc. were dispatched to the mine site and performed work from September 12 through September 19, 1999. Charles Dan Cottingham, a mechanic for Dixie Railway Services, arrived at the mine site and joined the other two Dixie employees on September 19, 1999.

.    .    .    .    .

On Saturday, September 18, 1999, Charles Dan Cottingham departed Cropwell, Alabama in a one-ton flat bed truck loaded with various locomotive parts and three crates containing eleven locomotive power assemblies. He arrived in Grundy, Virginia and contacted Scott Barrett, mechanic, and Edward Barrett, mechanic helper, who were staying at a local motel. On Sunday, September 19, 1999, at approximately 6:00 a.m., Cottingham and the Barretts arrived at the Virginia Pocahontas 1 mine to continue the engine maintenance

work on the No. 1493 locomotive. The workmen commenced unloading the power assemblies from the truck. A second truck containing an auto crane was used to lift the materials from the flat bed truck. Each crate consisted of a wooden top and bottom with no connecting sides. A maximum of four power assemblies were packed in each crate. Each power assembly weighed 625 pounds. The tops of the crates were removed and the power assemblies were lifted from the bottom portion of the crates, one or two assemblies at a time. A metal lifting bracket containing an attachment ring was bolted to the top of each single power assembly for the purpose of attaching a hook or a rope sling for lifting. The individual power assemblies were removed from the bottom portion and laid on the ground until the crate was emptied. The bottom portion of the crate was then placed on the ground and each individual power assembly was lifted and placed back on the bottom portion of the crate. Once four power assemblies had been repositioned on the bottom portion of the crate, the top portion of the crate was installed in order to stabilize the assemblies.

This procedure continued throughout the day until nine power assemblies had been removed from the truck. Scott Barrett stood on the ground at the rear of the driver's side of the flat bed truck and operated the auto crane through the use of a hand held controlling device. Edward Barrett stood on the ground on the driver's side of the flat bed truck and unhooked each power assembly as it was unloaded. Cottingham stood on the flat bed truck and connected the crane hook and the lifting devices to the individual power assemblies.

The top of the third crate had been removed and the ninth power assembly

was placed on the ground. Two free standing uncrated power assemblies were left in an unstable position on the truck. The power assembles were twelve inches in diameter at the top end, six inches in diameter at the bottom end, and were 46 inches high. Each power assembly stood vertically on the small end in the bottom portion of the crate. This caused the top heavy power assemblies to be unstable in the uncrated position. The truck bed sloped five degrees downward toward the passenger side of the vehicle, further contributing to the instability of the power assemblies. At approximately 4:45 p.m., Cottingham, standing on the passenger's side of the truck bed, was attempting to make a connection to unload the tenth power assembly. Scott Barrett swung the crane hook and cable over the truck. Cottingham grabbed for the swinging hook and missed. Cottingham lost his balance and began falling backward. Instinctively Cottingham grabbed the two power assemblies. Cottingham and the two unstable power assemblies fell from the bed of the truck to the ground. Cottingham suffered fatal head injuries when struck by one of the power assemblies. Scott and Edward Barrett ran to where Cottingham was lying. Scott Barrett called the victim's name, checked the victim and found no vital signs. Edward Barrett immediately drove about one mile to the nearest telephone to summon emergency medical assistance.

The Grundy Ambulance Service, Inc. received the call. A rescue unit arrived at the site at 4:57 p.m. James Burke and other rescue squad members checked the victim for vital signs. The victim was unresponsive and attempts to revive him were unsuccessful.

(Report of Investigation 1–3, Pls.' Br. Supp. Mot. Summ. J., Ex. A.)

MSHA determined that the accident had been caused by "the lack of suitable lifting devices." (*Id.* at 7.) Following MSHA's investigation, it issued citations against Island Creek, Dixie, and Don's Railway Services for violation of MSHA regulations. The two citations against Island Creek alleged that it had failed to provide hazard training to employees of Don's Railway Service in violation of 30 C.F.R. § 48.31 and that it had failed to maintain a written record of information concerning an independent contractor, Don's Railway Services, in violation of 30 C.F.R. § 45.4(b). Island Creek paid small civil penalties as a result of these citations.[3]

The plaintiffs have retained an expert, Gary L. Buffington, a former MSHA employee, who opines, among other things, that had Dixie's employees received appropriate hazard training by Island Creek, Island Creek would have recognized that the proposed unloading of the power assemblies was unsafe and thus Island Creek would not have allowed Dixie's employees access to its property "without . . . a suitable lifting device to lift the crate as one unit or . . . some kind of guardrails or fall protection to eliminate the fall exposure from the flat bed truck." (Buffington Aff. 18.)

### III

Summary judgment is appropriate when there is "no genuine issue of material

---

**3.** There is no evidence that MSHA connected these violations to Cottingham's death. For example, the Island Creek violations refer to Don's Railway Services, not to Cottingham's employer, Dixie. Island Creek was not issued any citations with reference to Dixie or its employees, including Cottingham. Moreover, the citations recite that it was unlikely that injury would result from the violations.

fact," given the parties' burdens of proof at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see* Fed.R.Civ.P. 56(c). In determining whether the moving party has shown that there is no genuine issue of material fact, a court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Id.* at 327, 106 S.Ct. 2548. It is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir.1993) (internal quotation marks omitted).

Under this court's diversity jurisdiction, I am obligated to apply the substantive law of the forum state. The required elements of a negligence cause of action in Virginia "are (1) the identification of a legal duty of the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff proximately caused by the breach." *Talley v. Danek Med., Inc.*, 179 F.3d 154, 157 (4th Cir.1999). In its Motion for Summary Judgment, the defendant contests the ability of the plaintiffs to prove any of these

elements, but its most powerful argument, and one that is conclusive of the case, relates to the lack of a breach of any legal duty Island Creek had to the deceased employee of Dixie.

■ The plaintiffs argue that the MSHA regulations created the legal duty of Island Creek to protect Cottingham from the unsafe work practices of his employer. However, they confuse the standard of care, which may be fixed by safety regulations such as those issued by MSHA, with the underlying duty established by law. *See Ellis v. Chase Communications, Inc.*, 63 F.3d 473, 478 (6th Cir. 1995) (holding in suit against owner of premises where employee of independent contractor was killed that even had there been a violation of OSHA safety regulations, the owner must owe a duty independent of OSHA in order to create liability). The Mine Act does not create a private cause of action for violation of its safety regulations. *Myers v. United States*, 17 F.3d 890, 901 (6th Cir.1994) (applying state law to Federal Tort Claims Act claim). Thus, while a mine operator may be responsible for the safety violations of its independent contractor when MSHA seeks to administratively enforce a withdrawal order, *see Cyprus Indus. Minerals Co. v. Fed. Mine Safety & Health Review Comm'n*, 664 F.2d 1116, 1119 (9th Cir. 1981), in a state-law negligence action such as this one, the Mine Act cannot be the source of the duty. *See Williamson v. Old Brogue, Inc.*, 232 Va. 350, 350 S.E.2d 621, 624 (1986) ("[A] statute may define the standard of care to be exercised where there is an underlying common-law duty, but the doctrine of negligence *per se* does not create a cause of action where none otherwise exists.").[4]

---

4. The plaintiffs rely on *Cooper v. Ingersoll Rand Co.*, 628 F.Supp. 1488, 1494 (W.D.Va.

1986), where this court found that the violation of federal mine safety regulations by a

The duty of care in this case could only arise if Island Creek had an obligation under Virginia law to protect Cottingham while he was on its property. Such a duty may be imposed on owners or occupiers of land under certain limited circumstances, but this case does not present such facts. Furthermore, even if the facts were different and Island Creek did have an obligation to protect Cottingham, the company's actions still would not have breached its duty.

Virginia law distinguishes between visitors based on their status as invitees, licensees, or trespassers and assigns markedly different duties of care to each category. A property owner owes the highest duty of care to an invitee, a person who enters upon invitation by the landowner and for the common interest or mutual benefit of the landowner and the guest. *See Pearson v. Canada Contracting Co.,* 232 Va. 177, 349 S.E.2d 106, 110 (1986). For example, the employee of an independent contractor hired by a landowner to do work on that landowner's building is an invitee. *Kalopodes v. Fed. Reserve Bank of Richmond,* 367 F.2d 47, 50 (4th Cir.1966). A landowner has the duty to warn invitees of any unsafe condition on the premises, including unsafe conditions that the owner did not know about, but should have discovered. *Fobbs v. Webb Bldg. Ltd. P'ship,* 232 Va. 227, 349 S.E.2d 355, 357 (1986).

A property owner owes a more limited duty to a licensee, a person who enters upon invitation by the landowner for her own interest, benefit, or convenience. *Pearson,* 349 S.E.2d at 110. For example, an ordinary social guest is a licensee. *Tate v. Rice,* 227 Va. 341, 315 S.E.2d 385, 388 (1984). A landowner has the duty to avoid causing licensees injuries through affirmative negligence, or by willful or wanton conduct. *Id.*

A property owner owes the most limited duty to a trespasser, a person who enters the land of another without the consent or permission of its owner. *See Pearson,* 349 S.E.2d at 110 (explaining that a trespasser enters "unlawfully"). As a general rule, the only duty a landowner owes a trespasser is to do her no intentional or willful harm. *Franconia Assocs. v. Clark,* 250 Va. 444, 463 S.E.2d 670, 673 (1995). The landowner violates this duty if she knows or should have known that a trespasser was in danger and nonetheless failed to exercise ordinary care to protect that trespasser from injury. *Id.*

The most important distinction for this case is between invitee status and the other categories of visitors. What duty of care Island Creek owed Cottingham turns on whether Cottingham was an invitee. The plaintiffs allege that Island Creek's negligent omission, that is, its failure to do something, caused Cottingham's accident. Landowners have a duty to avoid causing injury through failures to act only to invitees. *See Tate,* 315 S.E.2d at 388. Only if Cottingham had invitee status would Island Creek have had an obligation to protect him while on Island Creek property. I find that the evidence, taken in the light

mine operator constituted the superceding cause of an accident and thus barred an injured employee's suit against the vendor of mining equipment. However, the question of duty was not discussed in the opinion and it is apparent that the employer owed a common law duty to its employee to provide a safe workplace. *See Bly v. S. Ry.,* 183 Va. 406, 32 S.E.2d 659, 659 (1945) ("[A]n employer owes to the employee the duty to exercise ordinary care that the place in which the servant is required to work be reasonably safe.") In *Cooper,* the breach of this duty was determined by the standard of care fixed by the MSHA regulations. *See* 628 F.Supp. at 1492.

most favorable to the non-moving party, presents no genuine issue of material fact on this question. Cottingham was not an invitee.

■ The VP–1 mine site was not open to the public. To gain access to the property, non-employees had to notify and gain approval for their visits from one of four members of Island Creek security: William Fertall, Engineering Manager; Barry Dangerfield, Fertall's supervisor; Robert Slone, Materials Control Supervisor; or Glenn Smith, Safety Manager. This notification allowed Island Creek to determine what type of training was necessary for its visitors. Members of the contract security force, who were not Island Creek's employees, were not authorized to approve visits to the mine site.

Dixie did not follow this procedure to inform Island Creek of its presence and request access to the property. Sometime between September 5 and September 12, 1999, Dave Zuspan, Dixie's General Director Mechanical, visited VP–1 to meet Don Adams and discuss future work on the locomotives. While waiting to meet Adams, Zuspan received hazard training from someone he happened to meet at a building near the locomotives. However, no Island Creek employee authorized to allow visitors on the property was aware of Zuspan's presence. Although Zuspan told someone at an office near the work site that he was there to meet with Don Adams, no one at that office knew Adams.

On September 12, Scott Barrett and Edward Barrett and two other Dixie employees began work at VP–1 to assist Don's in repairing the locomotives. Cottingham was not part of this original crew. During their work, neither Scott nor Edward Barrett informed Island Creek that they were on its property.

Even though Island Creek did not invite Dixie onto the VP–1 site, Dixie employees still could have been invitees if their presence at the site was for the common interest or mutual benefit of Island Creek and Dixie. *See Pearson*, 349 S.E.2d at 110. However, Dixie was not completing work that would mutually benefit Island Creek—Dixie was repairing its own locomotives. It is argued that Island Creek's sale of the locomotives "as is, where is" impliedly conveyed invitee status on the purchaser of those locomotives. However, that sale did not convert VP–1 into public space where any subsequent purchaser, like Dixie, could enter and leave the property at will. Indeed, there is no evidence whether Island Creek officials even knew Dixie employees would visit the site or when those visits might occur.

Not only did Dixie fail to inform Island Creek of its presence, but the security force did not discover that the Dixie crew was present. On weekday nights and weekend days, a contract security guard, Joseph Lee, III, patrolled the section of VP–1 where the locomotives were located. Lee never saw anyone working on the locomotives and was unaware of any ongoing activity in the area.

Lee's supervisor, Alonzo Vance, did know that some contractors would be working on the locomotives during one week in July. Although he was responsible for recording any visits to the site, he received no reports of anyone working at VP–1 and was unaware that anyone already had arrived to perform the work on the locomotives until he learned about the fatality. Even if the security officers had observed the Dixie crew working on the locomotives, Vance explains that it is not likely they would have reported that activity to Island Creek.

Finally, Island Creek had no way to anticipate Cottingham's arrival at VP–1. Dixie management decided just a day or

two before the accident that Cottingham would drive the power assemblies to the VP–1 site. The Dixie work crew did not know exactly when the power assemblies would arrive or who would bring them; therefore, Island Creek could not have known when they would arrive.

The plaintiffs suggest several facts to support their argument that Island Creek was aware of Dixie's work at VP–1 and acquiesced to its employees' presence at the mine site. First, Scott Barrett reports that "some employee of Island Creek came to the place where we were working on the locomotives and requested that we give a message to Don Adams, of Don's Railway Services." (S. Barrett Aff. at ¶ 5.) Second, someone opened a locked gate each day so that the Dixie crew could enter the mine site. Third, the Dixie crew wore uniforms saying "Dixie Engine & Equipment" or "Dixie Railway Services." (*Id.* at ¶ 3.)

These facts are not enough to establish Island Creek's knowledge of Dixie's presence at VP–1. They show neither that Island Creek invited Dixie employees to the property nor mutually benefited from Dixie's work on the property, which would be required for Cottingham to have been an invitee. While "some employee" spoke to the Barretts at the work site, that person has not been identified and there is no evidence that the Barretts specifically informed that person that they worked for Dixie, and not for Don's. No evidence shows that it was an Island Creek employee who opened the gate for the Dixie crew each day. Finally, to infer knowledge of Dixie's presence at VP–1 from the fact that Dixie employees wore uniforms is too far reaching, even considering that all inferences must be drawn in the light most

favorable to the plaintiffs. I must conclude that Cottingham was not an invitee.

■ Even if Cottingham had been an invitee, Island Creek's actions would not have breached its duty to keep the mine premises in a safe condition. A landowner must warn invitees of any unsafe condition on the premises, including unsafe conditions that the owner did not know about, but should have discovered. *Fobbs v. Webb Bldg. Ltd. P'ship*, 232 Va. 227, 349 S.E.2d 355, 357 (1986). Even when a visitor is an invitee, however, Virginia law still does not make the owner an insurer of the visitor's safety. *See Winn–Dixie Stores, Inc. v. Parker*, 240 Va. 180, 396 S.E.2d 649, 650 (1990).

■ The plaintiffs contend that Island Creek violated its duty because it failed to discover and warn that Cottingham was unloading the power assemblies in an unsafe manner. But a landowner has no duty to protect business invitees from the unlawful acts of a third party. *See Shortt v. Richlands Mall Assocs.*, 781 F.Supp. 454, 458 (W.D.Va.1991) (holding that mall owner had no duty to protect mall customer from reckless drivers in its parking lot).[5] As previously discussed, the need to unload the power assemblies was not even apparent to Dixie until a short time before the accident, and certainly not reasonably foreseeable to Island Creek.

## IV

For the foregoing reasons, I find that the plaintiffs have not shown the existence of any duty by Island Creek to protect the deceased under the facts of this case. Accordingly, I will grant Island Creek's Mo-

---

**5.** The plaintiffs contend that *Shortt* is inapplicable because coal mine property is inherently more dangerous than a shopping mall.

While that may be so, the legal principle remains the same.

tion for Summary Judgment and enter final judgment for it.[6]

---

6. Because judgment will be entered for the defendant, I will deny the plaintiffs' Motion for Summary Judgment. It is unnecessary for me to consider the other grounds for summary judgment urged by Island Creek.